DENNIS *v.* HIGGINS, DIRECTOR, NEBRASKA DE-
PARTMENT OF MOTOR VEHICLES, ET AL.

No. 89–1555.  Argued October 31, 1990—Decided February 20, 1991

WHITE, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, STEVENS, O'CONNOR, SCALIA, and SOUTER, JJ., joined. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 451.

*Richard E. Allen* argued the cause and filed briefs for petitioner.

*L. Jay Bartel,* Assistant Attorney General of Nebraska, argued the cause for respondents. With him on the brief were *Robert M. Spire,* Attorney General, and *Arthur E. Wilmarth, Jr.* *

JUSTICE WHITE delivered the opinion of the Court.

This case presents the question whether suits for violations of the Commerce Clause may be brought under 93 Stat. 1284, as amended, 42 U. S. C. § 1983. We hold that they may.

---

*\*Andrew L. Frey, Kenneth S. Geller, Andrew J. Pincus, Daniel R. Barney, Robert Digges, Jr., Laurie T. Baulig,* and *William S. Busker* filed a brief for the American Trucking Associations, Inc., as *amicus curiae* urging reversal.

*Charles Rothfeld* and *Benna Ruth Solomon* filed a brief for the National Conference of State Legislatures et al. as *amici curiae* urging affirmance.

## I

Petitioner does business as an unincorporated motor carrier with his principal place of business in Ohio. He owns tractors and trailers that are registered in Ohio and operated in several States including Nebraska. On December 17, 1984, he filed a class action in a Nebraska trial court challenging the constitutionality of certain "retaliatory" taxes and fees imposed by the State of Nebraska on motor carriers with vehicles registered in other States and operated in Nebraska.[1] In his complaint, petitioner claimed, *inter alia*, that the taxes and fees constituted an unlawful burden on interstate commerce and that respondents were liable under 42 U. S. C. § 1983. Petitioner sought declaratory and injunctive relief, refunds of all retaliatory taxes and fees paid, and attorney's fees and costs.

After a bench trial based on stipulated facts, the court concluded that the taxes and fees at issue violated the Commerce Clause "because they are imposed only on motor carriers whose vehicles are registered outside the State of Nebraska, while no comparable tax or fee is imposed on carriers whose vehicles are registered in the State of Nebraska." App. to Pet. for Cert. 29a. It therefore permanently enjoined respondents from "assessing, levying, or collecting" the taxes and fees. *Id.*, at 30a. The court also held that petitioner was entitled to attorney's fees and expenses under the equitable "common fund" doctrine. The court, however, entered judgment for respondents on the remaining claims, including the § 1983 claim. Petitioner appealed the dismissal

---

[1] The taxes and fees at issue were imposed pursuant to Neb. Rev. Stat. § 60–305.02 (1984), which has since been amended. The taxes and fees were considered "retaliatory" because they were imposed on vehicles registered in certain other States (Arizona, Arkansas, Idaho, Nevada, New York, Ohio, Oregon, Pennsylvania, and Wyoming) in an amount equal to the "third structure taxes" imposed by those States on Nebraska-registered vehicles. "Third structure taxes" are taxes and fees imposed in addition to registration fees and fuel taxes (so-called "first structure" and "second structure" taxes).

of his § 1983 claim, and respondents cross-appealed the trial court's allowance of attorney's fees and expenses under the common fund doctrine. Respondents did not, however, appeal the trial court's determination that the retaliatory taxes and fees violated the Commerce Clause.

The Supreme Court of Nebraska affirmed the dismissal of petitioner's § 1983 claim, but reversed the trial court's allowance of fees and expenses under the common fund doctrine. See *Dennis* v. *State*, 234 Neb. 427, 451 N. W. 2d 676 (1990). With respect to the § 1983 claim, the Nebraska Supreme Court held that "[d]espite the broad language of § 1983 . . . there is no cause of action under § 1983 for violations of the commerce clause." *Id.*, at 430, 451 N. W. 2d, at 678. The court relied largely on the reasoning in *Consolidated Freightways Corp. of Delaware* v. *Kassel*, 730 F. 2d 1139 (CA8), cert. denied, 469 U. S. 834 (1984), which held that claims under the Commerce Clause are not cognizable under § 1983 because, among other things, "the Commerce Clause does not establish individual rights against government, but instead allocates power between the state and federal governments." 730 F. 2d, at 1144.

As the Supreme Court of Nebraska recognized, see 234 Neb., at 430, 451 N. W. 2d, at 678, there is a division of authority on the question whether claims for violations of the Commerce Clause may be brought under § 1983.[2] We granted certiorari to resolve this issue, 495 U. S. 956 (1990), and we now reverse.

---

[2] Compare *Kraft* v. *Jacka*, 872 F. 2d 862, 869 (CA9 1989); *J & J Anderson, Inc.* v. *Erie*, 767 F. 2d 1469, 1476–1477 (CA10 1985); and *Consolidated Freightways Corp. of Delaware* v. *Kassel*, 730 F. 2d 1139 (CA8), cert. denied, 469 U. S. 834 (1984), with *Continental Illinois Corp.* v. *Lewis*, 838 F. 2d 457, 458 (CA11 1988), vacated on other grounds, 494 U. S. 472 (1990); *Martin-Marietta Corp.* v. *Bendix Corp.*, 690 F. 2d 558, 562 (CA6 1982); and *Kennecott Corp.* v. *Smith*, 637 F. 2d 181, 186, n. 5 (CA3 1980). See also *Private Truck Council of America, Inc.* v. *Quinn*, 476 U. S. 1129 (1986) (WHITE, J., joined by Brennan and O'CONNOR, JJ., dissenting from denial of certiorari) (noting conflict of authority).

## II

A broad construction of § 1983[3] is compelled by the statutory language, which speaks of deprivations of *"any* rights, privileges, or immunities secured by the Constitution and laws." (Emphasis added.) Accordingly, we have "repeatedly held that the coverage of [§ 1983] must be broadly construed." *Golden State Transit Corp.* v. *Los Angeles,* 493 U. S. 103, 105 (1989). The legislative history of the section also stresses that as a remedial statute, it should be "'liberally and beneficently construed.'" *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 684 (1978) (quoting Rep. Shellabarger, Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871)).[4]

---

[3] Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[4] The dissent contends that the legislative history of § 1983 supports the proposition that § 1983 does not apply to constitutional provisions that allocate power. See *post,* at 454–457. That argument is untenable. The dissent chiefly relies upon a partial quotation of a statement made by Representative Shellabarger, one of the principal sponsors of the statute. In context, the statement reads:

*"My next proposition is historical, and one simply in aid and support of the truth of the first* [*i. e.,* that "Congress is bound to execute, by legislation, every provision of the Constitution, even those provisions not specially named as to be so enforced"]. *It is that the United States always has assumed to enforce, as against the States, and also persons, every one of the provisions of the Constitution.* Most of the provisions of the Constitution which restrain and directly relate to the States, such as those in tenth section of first article, that 'no State shall make a treaty,' 'grant letters of marque,' 'coin money,' 'emit bills of credit,' &c., relate to the divisions of the political powers of the State and General Governments. They do not relate directly to the rights of persons within the States and as between the States and such persons therein. These prohibitions upon the political

As respondents argue, the "prime focus" of § 1983 and related provisions was to ensure "a right of action to enforce the protections of the Fourteenth Amendment and the fed-

---

powers of the States are all of such nature that they can be, and even have been, when the occasion arose, enforced by the courts of the United States declaring void all State acts of encroachment on Federal powers. Thus, and thus sufficiently, has the United States 'enforced' these provisions of the Constitution. But there are some that are not of this class. These are where the court secures the rights or the liabilities of persons within the States, as between such persons and the States.

"These three are: first, that as to fugitives from justice; second, that as to fugitives from service, (or slaves;) third, that declaring that the 'citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States.'

"*And, sir, every one of these—the only provisions where it was deemed that legislation was required to enforce the constitutional provisions— the only three where the rights or liabilities of persons in the States, as between these persons and the States, are directly provided for, Congress has by legislation affirmatively interfered to protect or to subject such persons.*" Cong. Globe, at App. 69–70 (emphasis added to reflect omissions in dissent).

It should first be noted that Shellabarger was not in the above quotation addressing the part of the 1871 statute that became § 1983, *i. e.*, § 1. Rather, he was discussing *§ 2* of the bill, which made it a federal crime to engage in a conspiracy "to do any act in violation of the rights, privileges, or immunities of another person . . . committed within a place under the sole and exclusive jurisdiction of the United States." *Id.*, at 68. A principal objection to that section was that Congress lacked the authority to enact it, because it infringed upon the powers reserved to the States by overriding their authority to define and punish crimes. See *id.*, at 69. In answering that argument, Shellabarger contended that Congress had the power to enforce by legislation "every one of the provisions of the Constitution." He observed that most of the provisions of the Constitution "which restrain and directly relate to the States" had been enforced by the courts without federal legislation, but noted that three provisions limiting state authority—the Extradition Clause, the Privileges and Immunities Clause, and the Fugitive Slave Clause—had been enforced pursuant to federal legislation.

It becomes clear that fully quoted and properly read, Shellabarger's remarks do not in any way aid the dissent. The dissent's attempt to characterize Shellabarger's argument for *expansive* federal power to enact crimi-

eral laws enacted pursuant thereto," *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 611 (1979), but the Court has never restricted the section's scope to the effectuation of that goal. Rather, we have given full effect to its broad language, recognizing that § 1983 "provide[s] a remedy, to be broadly construed, against all forms of official violation of federally protected rights." *Monell, supra,* at 700–701. Thus, for example, we have refused to limit the phrase "and laws" in § 1983 to civil rights or equal protection laws. See *Maine* v. *Thiboutot*, 448 U. S. 1, 4, 6–8 (1980).

Even more relevant to this case, we have rejected attempts to limit the types of constitutional rights that are encompassed within the phrase "rights, privileges, or immunities." For example, in *Lynch* v. *Household Finance Corp.*, 405 U. S. 538 (1972), we refused to limit the phrase to "personal" rights, as opposed to "property" rights.[5] We first

---

nal legislation as support for a *narrow* construction of § 1983 is strained, to say the least. Shellabarger simply did not address the issues of which constitutional provisions establish "rights, privileges, or immunities," whether the Commerce Clause falls into that category, or whether provisions that allocate power cannot also confer rights. Nor would it be likely that he would have made any of the statements on these points argued by the dissent, given this Court's then-recent holding that the affirmative grant of power to Congress in the Credit Clause established a "right, privilege, or immunity." See *The Banks* v. *The Mayor,* 7 Wall. 16, 22 (1869). The other snippets of legislative history relied upon by the dissent, see *post,* at 456–457, are similarly inapposite and inconclusive.

In any event, even if the dissent's cut-and-paste history could be read to provide some support for its formalistic distinction between power-allocating and rights-conferring provisions of the Constitution, it plainly does not constitute a "a clearly expressed legislative intent contrary to the plain language of [§ 1983]." *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 75 (1982). Rather, if Congress had intended to limit the "broad and unqualified" language of § 1983, "it is not unreasonable to assume that it would have made this explicit." *St. Paul Fire & Marine Ins. Co.* v. *Barry*, 438 U. S. 531, 550 (1978).

[5] The statute at issue in *Lynch* was the jurisdictional counterpart to § 1983, 28 U. S. C. § 1343(3), which contains the same "rights, privileges, or immunities" phrase. Even the dissent in *Lynch* agreed "without res-

noted that neither the words nor the legislative history of the statute distinguished between personal and property rights. *Id.*, at 543. We also rejected that distinction because of the "virtual impossibility" of applying it, particularly in "mixed" cases involving both types of rights. *Id.*, at 550–551. We further concluded that "the dichotomy between personal liberties and property rights is a false one. . . . The right to enjoy property without unlawful deprivation, no less than the right to speak or the right to travel, is in truth a 'personal' right, whether the 'property' in question be a welfare check, a home, or a savings account." *Id.*, at 552. See also *United States* v. *Price,* 383 U. S. 787, 800–806 (1966).

Petitioner contends that the Commerce Clause confers "rights, privileges, or immunities" within the meaning of § 1983. We agree. The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U. S. Const., Art. I, § 8, cl. 3. Although the language of that Clause speaks only of Congress' power over commerce, "the Court long has recognized that it also limits the power of the States to erect barriers against interstate trade." *Lewis* v. *BT Investment Managers, Inc.,* 447 U. S. 27, 35 (1980).[6]

---

ervation" that the phrase was not limited to violations of "personal" rights, but disagreed with the majority on a different issue. See 405 U. S., at 556.

[6] See, *e. g.,* *CTS Corp.* v. *Dynamics Corp. of America,* 481 U. S. 69, 87 (1987); *Hughes* v. *Oklahoma,* 441 U. S. 322, 326 (1979); *Great Atlantic & Pacific Tea Co.* v. *Cottrell,* 424 U. S. 366, 370–371 (1976); *Cooley* v. *Board of Wardens of Port of Philadelphia,* 12 How. 299, 318 (1852). These cases are distinguishable from cases involving assertions that state regulations of commerce directly conflict with federal regulations enacted under the authority of the Commerce Clause. An example of the latter is *Gibbons* v. *Ogden,* 9 Wheat. 1 (1824), in which the Court struck down a New York statute to the extent that it excluded federally licensed boats from operating in New York waters.

Respondents argue, as the court below held, that the Commerce Clause merely allocates power between the Federal and State Governments and does not confer "rights." Brief for Respondents 14–17. There is no doubt that the Commerce Clause is a power-allocating provision, giving Congress pre-emptive authority over the regulation of interstate commerce. It is also clear, however, that the Commerce Clause does more than confer power on the Federal Government; it is also a substantive "restriction on permissible state regulation" of interstate commerce. *Hughes* v. *Oklahoma*, 441 U. S. 322, 326 (1979). The Commerce Clause "has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South-Central Timber Development, Inc.* v. *Wunnicke*, 467 U. S. 82, 87 (1984). In addition, individuals injured by state action that violates this aspect of the Commerce Clause may sue and obtain injunctive and declaratory relief. See, *e. g.*, *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Fla.*, 496 U. S. 18, 31 (1990). Indeed, the trial court in the case before us awarded petitioner such relief, and respondents do not contest that decision. We have also recently held that taxpayers who are required to pay taxes before challenging a state tax that is subsequently determined to violate the Commerce Clause are entitled to retrospective relief "that will cure any unconstitutional discrimination against interstate commerce during the contested tax period." *Id.*, at 51. This combined restriction on state power and entitlement to relief under the Commerce Clause amounts to a "right, privilege, or immunity" under the ordinary meaning of those terms.[7]

---

[7] See, *e. g.*, Black's Law Dictionary 1324 (6th ed. 1990) (defining "right" as "[a] legally enforceable claim of one person against another, that the other shall do a given act, or shall not do a given act") (citing Restatement of Property § 1 (1936)). That the right at issue here is an implied right under the Commerce Clause does not diminish its status as a "right, privi-

The Court has often described the Commerce Clause as conferring a "right" to engage in interstate trade free from restrictive state regulation. In *Crutcher* v. *Kentucky*, 141 U. S. 47 (1891), in which the Court struck down a license requirement imposed on certain out-of-state companies, the Court stated: "To carry on interstate commerce is not a franchise or a privilege granted by the State; it is a right which every citizen of the United States is entitled to exercise under the Constitution and laws of the United States." *Id.*, at 57. Similarly, *Western Union Telegraph Co.* v. *Kansas ex rel. Coleman*, 216 U. S. 1, 26 (1910), referred to "the substantial rights of those engaged in interstate commerce." And *Garrity* v. *New Jersey*, 385 U. S. 493, 500 (1967), declared that engaging in interstate commerce is a "righ[t] of constitutional stature." More recently, *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318 (1977), held that regional stock exchanges had standing to challenge a tax on securities transactions as violating the Commerce Clause because, among other things, the exchanges were "asserting their right under the Commerce Clause to engage in interstate commerce free of discriminatory taxes on their business and they allege that the transfer tax indirectly infringes on that right." *Id.*, at 320, n. 3.

Last Term, in *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103 (1989), we set forth three considerations for determining whether a federal *statute* confers a "right" within the meaning of § 1983:

> "In deciding whether a federal right has been violated, we have considered [1] whether the provision in question

---

lege, or immunity" under § 1983. Indeed, we have already rejected a distinction between express and implied rights under § 1983 in the statutory context. "The violation of a federal right that has been found to be implicit in a statute's language and structure is as much a 'direct violation' of a right as is the violation of a right that is clearly set forth in the text of the statute." *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 112 (1989).

creates obligations binding on the governmental unit or rather 'does no more than express a congressional preference for certain kinds of treatment.' *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 19 (1981). [2] The interest the plaintiff asserts must not be 'too vague and amorphous' to be 'beyond the competence of the judiciary to enforce.' *Wright* v. *Roanoke Redevelopment and Housing Authority,* 479 U. S. 418, 431–432 (1987). [3] We have also asked whether the provision in question was 'intend[ed] to benefit' the putative plaintiff. *Id.,* at 430; see also *id.,* at 433 (O'CONNOR, J., dissenting) (citing *Cort* v. *Ash,* 422 U. S. 66, 78 (1975)." *Id.,* at 106.

See also *Wilder* v. *Virginia Hospital Assn.,* 496 U. S. 498, 509 (1990). Respondents do not dispute that the first two considerations weigh in favor of recognition of a right here, but seize upon the third consideration—intent to benefit the plaintiff—arguing that the Commerce Clause does not confer rights within the meaning of § 1983 because it was not designed to benefit individuals, but rather was designed to promote national economic and political union. Brief for Respondents 19–24.

This argument, however, was implicitly rejected in *Boston Stock Exchange, supra,* at 321, n. 3, where we found that the plaintiffs were arguably within the "zone of interests" protected by the Commerce Clause. Moreover, the Court's repeated references to "rights" under the Commerce Clause constitute a recognition that the Clause *was* intended to benefit those who, like petitioner, are engaged in interstate commerce. The "[c]onstitutional protection against burdens on commerce is for [their] benefit . . . ." *Morgan* v. *Virginia,* 328 U. S. 373, 376–377 (1946). As Justice Jackson, writing for the Court, eloquently explained:

> "Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free

access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality." *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 539 (1949).

Respondents attempt to analogize the Commerce Clause to the Supremacy Clause, Brief for Respondents 17–18, which we have held does not by itself confer any "rights, privileges, or immunities" within the meaning of § 1983. See *Golden State, supra*, at 106; *Chapman*, 441 U. S., at 613. The Supremacy Clause, however, is "not a source of any federal rights"; rather, it "'secure[s]' federal rights by according them priority whenever they come in conflict with state law." *Ibid.* By contrast, the Commerce Clause of its own force imposes limitations on state regulation of commerce and is the source of a right of action in those injured by regulations that exceed such limitations.[8]

Respondents also argue that the protection from interference with trade conferred by the Commerce Clause cannot be a "right" because it is subject to qualification or elimination by Congress. Brief for Respondents 21. That argument proves too much, however, because federal statutory rights may also be altered or eliminated by Congress. Until Congress does so, such rights operate as "a guarantee of freedom for private conduct that the State may not abridge."

---

[8] An additional reason why claims under the Supremacy Clause, unlike those under the Commerce Clause, should be excluded from the coverage of § 1983 is that if they were included, the "and laws" provision in § 1983 would be superfluous. See *Golden State*, 493 U. S., at 107, n. 4.

*Golden State, supra,* at 112.    The same is true of the Commerce Clause.[9]

## III

We conclude that the Supreme Court of Nebraska erred in holding that petitioner's Commerce Clause claim could not be brought under 42 U. S. C. § 1983.    The judgment of the Supreme Court of Nebraska is therefore reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE joins, dissenting.

In *Golden State Transit Corp.* v. *Los Angeles,* 493 U. S. 103, 114 (1989), I dissented from the Court's determination that 42 U. S. C. § 1983 creates a cause of action for damages when the only wrong committed by the State or local entity is its misapprehension of the boundary between state and federal power.    Today's decision compounds the error of *Golden State.*    The majority drifts far from the purposes and history of § 1983 and again holds § 1983 applicable to a State's quite innocent but mistaken judgment respecting the shifting boundary between two sovereign powers.    The majority removes one of the statute's few remaining limits and increases the burden that a state or local government will face in de-

---

[9] In arguing that the Commerce Clause does not secure any rights, privileges, or immunities within the meaning of § 1983, the dissent relies upon *Carter* v. *Greenhow,* 114 U. S. 317 (1885).    See *post,* at 457–458.    This Court, however, has already given that decision a narrow reading, stating that the case "held as a matter of pleading that the particular cause of action set up in the plaintiff's pleading was in contract and was not to redress deprivation of the 'right secured to him by that clause of the Constitution' [the contract clause], to which he had 'chosen not to resort.'" *Chapman* v. *Houston Welfare Rights Organization,* 441 U. S. 600, 613, n. 29 (1979); see also *Hague* v. *Committee for Industrial Organization,* 307 U. S. 496, 527 (1939) (opinion of Stone, J.).

fending its economic regulation and taxation. With respect, I dissent.

## I

The majority must acknowledge, under even *Golden State*, that not all violations of federal law give rise to a § 1983 action. The plaintiff must assert "rights, privileges, or immunities secured by the Constitution and laws." 42 U. S. C. § 1983. The majority appears to base its decision upon three grounds. First, the "ordinary meaning" of the term "right" as confirmed by Black's Law Dictionary indicates that the Commerce Clause provides petitioner a right. *Ante*, at 447, and n. 7. Second, our cases contain scattered references to a "right" to engage in interstate commerce. *Ante*, at 448. And third, the Commerce Clause purportedly meets *Golden State*'s test to determine whether a *statutory* violation gives rise to a § 1983 cause of action, because the Commerce Clause was intended to benefit those who engage in interstate commerce. *Ante*, at 448–450. The majority errs, I must submit, when it ignores what the sponsors of § 1983 told us about the scope of the phrase "rights, privileges or immunities secured by the Constitution," and errs further when it applies the *Golden State* test in this context. Even were I to apply the majority's various tests, moreover, I would reach the opposite conclusion.

## A

The *Golden State* test, arguably necessary in assessing whether any of the hundreds of statutory provisions that confer express obligations upon the States secure rights within the meaning of § 1983, is not appropriate in this case, where the question is whether a right is secured by a provision of the Constitution. Constitutional provisions are not so numerous, nor enacted with such frequency, that we are compelled to apply an ahistorical test. There is a ready alternative. We can distinguish between those constitutional provisions which secure the rights of persons vis-à-vis the States, and those provisions which allocate power between

the Federal and State Governments.   The former secure rights within the meaning of § 1983, but the latter do not.

The Commerce Clause, found at Art. I, § 8, cl. 3, of the Constitution, is a grant of power to Congress.   It states simply that "[t]he Congress shall have Power . . . To regulate commerce . . . among the several States."   By its own terms as well as its design, as interpreted by this Court, the Commerce Clause is a structural provision allocating authority between federal and state sovereignties.   It does not purport to secure rights.   The history leading to the drafting and ratification of the Constitution confirms these premises.

The lack of a national power over commerce during the Articles of Confederation led to ongoing disputes among the States, and the prospect of a descent toward even more intense commercial animosity was one of the principal arguments in favor of the Constitution.   See, *e. g.*, The Federalist No. 7, pp. 62–63 (C. Rossiter ed. 1961) (A. Hamilton); *id.*, No. 11, pp. 89–90 (A. Hamilton); *id.*, No. 22, pp. 143–145 (A. Hamilton); *id.*, No. 42, pp. 267–269 (J. Madison); *id.*, No. 53, p. 333 (J. Madison).

> "The sole purpose for which Virginia initiated the movement which ultimately produced the Constitution was 'to take into consideration the trade of the United States; to examine the relative situations and trade of the said States; to consider how far a uniform system in their commercial regulations may be necessary to their common interest and their permanent harmony.'"   *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 533 (1949) (citation omitted).

The Framers intended the Commerce Clause as a way to preserve economic union and to suppress interstate rivalry. The Clause assigned prerogatives to the general government, not personal rights to those who engaged in commerce. See, *e. g.*, *id.*, at 533–535; *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 523 (1935); Collins, Economic Union as a Constitutional Value, 63 N. Y. U. L. Rev. 43, 51–56 (1988).

"The necessity of centralized regulation of commerce among the states was so obvious and so fully recognized that the few words of the Commerce Clause were little illuminated by debate." *H. P. Hood & Sons, Inc., supra,* at 534. An exhaustive examination of the debates reports only nine references to interstate commerce in the records of the Convention, all directed at the dangers of interstate rivalry and retaliation. See Abel, The Commerce Clause in the Constitutional Convention and in Contemporary Comment, 25 Minn. L. Rev. 432, 470–471, and nn. 169–175 (1941). It is not for serious dispute that the Framers of the Commerce Clause had economic union as their goal, nor that their deliberations are devoid of any evidence of intent to secure personal rights under this Clause.

Section 1983 has its origins in § 2 of the Civil Rights Act of 1866, 14 Stat. 27, and § 1 of the Civil Rights Act of 1871, 17 Stat. 13. See *Lynch* v. *Household Finance Corp.,* 405 U. S. 538, 543, n. 7 (1972). Until recent cases, we have placed great reliance upon the sponsors of the 1871 Act in interpreting the scope of § 1983. See, *e. g., Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 690 (1978) ("[A]nalysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities . . . to be included among those persons to whom § 1983 applies" (emphasis in original)); *Lynch, supra,* at 545–546 (sponsors intended § 1983 to protect property rights as well as personal rights); *Monroe* v. *Pape,* 365 U. S. 167, 172–185 (1961) (legislative history of § 1983 supports the conclusion that § 1983 plaintiff need not exhaust state remedies).

Those same sponsors of § 1983 understood and announced a distinction between power-allocating and rights-securing provisions of the Constitution. In discussing the meaning of the phrase "rights, privileges or immunities" in the original House version of § 2 of the 1871 Act, Representative Shellabarger, Chairman of the House Select Committee which drafted the Act, and floor manager for the bill, explained:

"Most of the provisions of the Constitution which restrain and directly relate to the States, such as those in tenth section of first article, that 'no State shall make a treaty,' 'grant letters of marque,' 'coin money,' 'emit bills of credit,' &c., relate to the divisions of the political powers of the State and General Governments. They do not relate directly to the rights of persons within the States and as between the States and such persons therein. These prohibitions upon the political powers of the States are all of such nature that they can be, and even have been, when the occasion arose, enforced by the courts of the United States declaring void all State acts of encroachment on Federal powers. Thus, and thus sufficiently, has the United States 'enforced' these provisions of the Constitution. But there are some that are not of this class. These are where the court secures the rights or the liabilities of persons within the States, as between such persons and the States.

"These three are: first, that as to fugitives from Justice; second, that as to fugitives from service, (or slaves;) third, that declaring that the 'citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States.'" Cong. Globe, 42d Cong., 1st Sess., App. 69–70 (1871) (hereinafter Cong. Globe) (referring to Art. IV, § 2, of the Constitution as securing rights of persons).

This passage confirms Representative Shellabarger's view that all but three provisions of the Constitution as first enacted allocate power rather than secure the rights of persons "as between such persons and the States," and that the power-allocating provisions had not been "enforced" by legislation, but instead could be asserted as grounds for invalidating state action. *Ibid.*[1] To those original provisions which

---

[1] Shellabarger was discussing the power of Congress to enact § 2 of the 1871 Act, and not the scope of § 1, which we know as 42 U. S. C. § 1983. Reliance upon Shellabarger's statement is nevertheless appropriate. The

secure rights of persons with respect to States, and within the meaning of § 1983, the sponsors of § 1983 added the constitutional guarantees contained in the Civil War Amendments, including the provisions of the Bill of Rights incorporated into the Fourteenth Amendment. Every specific mention of rights secured by the 1871 Act refers to these constitutional provisions. See, *e. g.*, Cong. Globe 475–476 (Rep. Dawes; privileges and immunities, Bill of Rights); *id.*, at App. 84–85 (Rep. Bingham; equal protection, first eight Amendments); *id.*, at App. 153 (Rep. Garfield; right to vote, privileges and immunities, equal protection).

Statements of other supporters of the 1871 Act provide further evidence that Congress did not consider the Commerce Clause to secure the rights of persons within the meaning of § 1983. Representative Hoar distinguished between two objectives of the Constitution: to "provide . . . for the protection and regulation of commercial intercourse, domestic and foreign"; and to "promote the general welfare by prohibiting the States from doing what is inconsistent with civil liberty, and compelling them to do what is essential to its maintenance." Cong. Globe 333. The 1871 Act was designed to enforce only those provisions of the Constitution providing for "the protection of personal liberty and civil rights," not "the protection of commerce." *Ibid.* Repre-

---

proposed § 2 used the phrase "rights, privileges or immunities of another person," Cong. Globe App. 69, and Shellabarger was discussing his understanding of the rights, privileges, and immunities secured by the Constitution and laws, not of any language which would differ in meaning as between § 1 and § 2 of the 1871 Act. It matters not whether one repeats Shellabarger's speech of many pages, or only the relevant portion thereof, for I do not rely upon Shellabarger's views of congressional power to legislate, but rather the distinction he articulated between power-allocating provisions and rights-conferring provisions, between those provisions which "*do not* relate directly to the rights of persons within the States and as between the States and such persons therein," and those which do "secure" "rights" of persons. *Ibid.* (emphasis added). Shellabarger's distinction is borne out by the remainder of the legislative history.

sentative Trumbull made the same distinction between these categories of constitutional provisions. *Id.*, at 575. The sponsors of § 1983 thus gave us a straightforward answer to the question of which constitutional violations give rise to a § 1983 action, and told us that violations of power-allocating provisions such as the Commerce Clause do not.

Not only did the 42d Congress understand the difference between rights-securing and power-allocating provisions of the Constitution, but this Court's decisions of more than 100 years support the distinction. All previous cases in which this Court has determined (or assumed) that a constitutional violation gives rise to a § 1983 cause of action alleged violations of rights-securing provisions of the Constitution, not power-allocating provisions. See, *e. g., Monroe* v. *Pape*, 365 U. S., at 171 ("Allegation of facts constituting a deprivation under color of state authority of a right guaranteed by the Fourteenth Amendment satisfies to that extent the requirement of R. S. § 1979 [§ 1983]"); *Lane* v. *Wilson*, 307 U. S. 268 (1939) (Fifteenth Amendment violation supports § 1983 cause of action).

In our only previous case discussing a § 1983 claim brought for the violation of a supposed right secured by Article I of the Constitution, we held that violation of the Contracts Clause does not give rise to a § 1983 cause of action. *Carter* v. *Greenhow*, 114 U. S. 317 (1885). As is true of the Commerce Clause, the Court held that the Contracts Clause can be said to secure individual rights "only indirectly and incidentally." *Id.*, at 322. The Court further explained that the only right secured by the Contracts Clause is the "right to have a judicial determination, declaring the nullity of the attempt to impair [a State's] obligation." *Ibid.*

The Contracts Clause of Art. I, § 10, provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." At least such language would provide some support for an argument that the Contracts Clause prohibits States from "doing what is inconsistent with civil liberty."

Cong. Globe 333 (Rep. Hoar). If the Contracts Clause, an express limitation upon States' ability to impair the contractual rights of citizens, does not secure rights within the meaning of § 1983, it assuredly demands a great leap for the majority to conclude that the Commerce Clause secures the rights of persons. The Commerce Clause is, if anything, a less obvious source of rights for purposes of § 1983, as its text only implies a limitation upon state power.

At best, all that can be said is that the Commerce Clause grants Congress the power to regulate interstate commerce; from this grant of power, the Court has implied a limitation upon the power of a State to regulate interstate commerce; and in turn, courts provide a person injured by taxation that exceeds the limits of the Commerce Clause the "right to have a judicial determination, declaring the nullity of the attempt to" levy a discriminatory tax. *Carter, supra,* at 322. I find it ironic that *Carter* draws a distinction of nearly the same character as *Golden State,* between provisions which directly secure rights and those which do so "only as an incident" of their purpose. *Golden State,* 493 U. S., at 109. Yet, the majority finds that the Commerce Clause was "intended to benefit the putative plaintiff," *Golden State, supra,* at 108, while *Carter* held that the Contracts Clause only provides incidental benefits.

In *Lynch* v. *Household Finance Corp.,* 405 U. S. 538 (1972), we rejected an attempt to limit § 1983 to personal rights as opposed to property rights, in that case a deprivation of property in violation of the Due Process Clause of the Fourteenth Amendment. The legislative history of § 1983 did not support such a distinction, and we recognized both its false nature and the impossibility of its application. Today, on the other hand, the Court rejects a distinction which finds strong support in the legislative history of § 1983 and would bring no difficulties of application. I see no good reason for this rejection and suggest that the Court's decision only can do mischief.

## B

The majority rejects the weight of historical evidence in favor of scattered statements in our cases that refer to a "right" to engage in interstate commerce. *Ante,* at 448. None of these cases, however, hold that the Commerce Clause secures a personal right. Instead, they interpret the Commerce Clause as allocating power among sovereigns. See *Crutcher* v. *Kentucky,* 141 U. S. 47, 57 (1891) (regulation of interstate commerce "not within the province of state legislation, but within that of national legislation"); *Western Union Telegraph Co.* v. *Kansas ex rel. Coleman,* 216 U. S. 1, 21 (1910) (same). If the majority chooses to rely upon such statements, far removed from the issue at hand, I would remind it that this Court, in a much closer context, has established that a case in which the plaintiff relies upon the dormant Commerce Clause "may be one arising under the Constitution, within the meaning of that term, as used in other statutes, but it is not one brought on account of the deprivation of a right, privilege or immunity secured by the Constitution." *Bowman* v. *Chicago & Northwestern R. Co.,* 115 U. S. 611, 615–616 (1885).[2] The statements upon which the majority relies are weak support for its conclusion.

In similar fashion, *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Fla.,* 496 U. S. 18 (1990), in which the majority finds re-

---

[2] The defendant in *Bowman* had refused to ship the plaintiff's product, relying upon an Iowa statute that prohibited shipment of intoxicating liquors. The plaintiff apparently argued that Iowa's statute violated the Commerce Clause and therefore could not excuse the defendant's failure to perform. The Court's opinion was construing the jurisdictional analogue to § 1983, which permitted appeal without regard to the amount in controversy "in any case brought on account of the deprivation of any right, privilege, or immunity secured by the Constitution of the United States, or of any right or privilege of a citizen of the United States." Rev. Stat. § 699 (1874). See Collins, "Economic Rights," Implied Constitutional Actions, and the Scope of Section 1983, 77 Geo. L. J. 1493, 1519–1520, 1549–1551 (1989).

cent support for its view of the Commerce Clause, merely applies our traditional due process analysis for deprivation of property to the context of exaction of an unlawful tax. *McKesson Corp.* holds that if a State insists that taxpayers pay first and obtain review of a tax's validity in a later refund action, then due process requires meaningful postpayment relief for taxes paid pursuant to an unconstitutional scheme. *Id.*, at 31. In discussing the nature of the constitutional violation, *McKesson Corp.* acknowledges that States are accorded great flexibility in structuring the remedy for a discriminatory tax that violates the Commerce Clause. Rather than refunding the tax, "to the extent consistent with other constitutional restrictions, the State may assess and collect back taxes from petitioner's competitors who benefited from the [discriminatory] rate reductions during the contested tax period." *Id.*, at 40. If the State refused to provide any remedy, then the taxpayer would arguably have a § 1983 claim, but that claim would be for a deprivation of property without due process of law, a violation of the Fourteenth Amendment, not of the Commerce Clause. *McKesson Corp.* in no way supports the existence of a § 1983 cause of action for Commerce Clause violations.

Finally, following *Golden State*, the majority asks whether the provision in question was intended to benefit the putative plaintiff. *Ante*, at 449. The majority fails to locate in the text or history of the Commerce Clause any such intent, but nevertheless concludes that any argument to the contrary was "implicitly rejected in *Boston Stock Exchange* [v. *State Tax Comm'n*, 429 U. S.,] at 321, n. 3, where we found that the plaintiffs were arguably within the 'zone of interests' protected by the Commerce Clause." *Ante*, at 449. I fail to see how a determination that a particular plaintiff is within the "zone of interests" protected by a provision requires a finding that the provision was intended to benefit that plaintiff, or secures a right for purposes of § 1983. To the contrary, our zone of interest cases have rejected any requirement that

there be a "congressional purpose to benefit the would-be plaintiff." *Clarke* v. *Securities Industry Assn.*, 479 U. S. 388, 399–400 (1987). The plaintiff need only demonstrate a "plausible relationship" between his interest and the policies to be advanced by the relevant provision. *Id.*, at 403.[3]

The majority's treatment of the question confuses the concept of standing with that of a cause of action. We have considered these as distinct categories and should continue to do so. See *Davis* v. *Passman*, 442 U. S. 228, 239–240, n. 18 (1979). A taxpayer such as petitioner may be arguably within the zone of interests protected by the Commerce Clause. This is not, however, sufficient to demonstrate that the Commerce Clause secures a right of petitioner within the meaning of § 1983. Thus, in *INS* v. *Chadha*, 462 U. S. 919, 935–936 (1983), we held that an individual had standing to raise a separation of powers challenge alleging a violation of the Presentment Clauses, Art. I, § 7, cls. 2 and 3. In a very

---

[3] In a search for evidence that the Commerce Clause was intended to benefit persons who engage in interstate commerce, the majority quotes *Morgan* v. *Virginia*, 328 U. S. 373, 376–377 (1946), as stating that " '[c]onstitutional protection against burdens on commerce is for [their] benefit . . . .' " *Ante*, at 449. The majority's snippet is part of a sentence which, if read in its entirety, does *not* state, as the quotation would make it seem, that the Commerce Clause was intended to benefit those who engage in interstate commerce. Rather, the entire passage is as follows:

"We think, as the Court of Appeals apparently did, that the appellant is a proper person to challenge the validity of this statute as a burden on commerce. If it is an invalid burden, the conviction under it would fail. The statute affects appellant as well as the transportation company. *Constitutional protection against burdens on commerce is for her benefit on a criminal trial for violation of the challenged statute.* Hatch v. Reardon, 204 U. S. 152, 160 [(1907)]; *Federation of Labor* v. *McAdory*, 325 U. S. 450, 463 [(1945)]." *Morgan, supra,* at 376–377 (emphasis added; footnote omitted).

*Morgan* merely held that a criminal defendant had standing to assert the Commerce Clause as a defense to a prosecution under a Virginia law that required segregation by race of passengers on interstate buses, rejecting the State of Virginia's argument that only the transportation company had standing to challenge the segregation law. 328 U. S., at 376–377.

fundamental sense, separation of powers is designed to secure individual liberty. Yet, we would not say that the Presentment Clauses secure personal rights. Rather, Chadha was able to assert the interests of the other branches of Government because he met our traditional test of standing.

I cannot doubt the truth of the statement, *ante,* at 449–450 (quoting *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S., at 539), that the Commerce Clause benefits individuals and entities engaged in interstate commerce. Nor do I question the importance of our dormant Commerce Clause jurisprudence in guaranteeing a single, national market. Benefits to those engaged in commerce, however, are incidental to the purpose of the Commerce Clause; they are but evidence of its sound application. That the Commerce Clause benefits individual traders or consumers does not satisfy the majority's test that a provision must have been intended for the benefit of a particular plaintiff; nor do such benefits prove that the provision secures a plaintiff's constitutional right to engage in any one activity, to receive any direct benefit, or to avoid any specific detriment. Rather, the Commerce Clause "benefits particular parties only as an incident of" its allocation of power between federal and state sovereignties. *Golden State,* 493 U. S., at 109.

I continue to draw the distinction made in my *Golden State* dissent, *id.,* at 113, and would hold that while the dormant Commerce Clause does not secure a right, it gives rise to a legal interest in petitioner against taxation which violates the dormant Commerce Clause. Thus, petitioner can rely upon the unconstitutionality of the tax in defending a collection action brought by the State, or in pursuing state remedies. This ability to invoke the Commerce Clause against a State, however, is not equivalent to finding a secured right under § 1983. If that were so, all violations of federal law would give rise to a § 1983 cause of action, and there would be little reason to search for statements supporting the existence of a right to engage in interstate commerce or to apply the

*Golden State* test.   The majority does not purport to rest its decision upon such an all-inclusive view of § 1983, but that is the necessary consequence of its reasoning.

The Court's analysis demonstrates the poverty of the "intended to benefit" test in the constitutional context, for it shows that even structural provisions that benefit individuals incidentally come within its purview.   The Court's logic extends far beyond the Commerce Clause, and creates a whole new class of § 1983 suits derived from Article I.   For example, the Court's rationale creates a § 1983 cause of action when a State violates the constitutional doctrine of intergovernmental tax immunity, *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 813 (1989) (violation of statute "coextensive with the prohibition against discriminatory taxes embodied in the modern constitutional doctrine of intergovernmental tax immunity"), interferes with the federal power over foreign relations, see *Zschernig* v. *Miller*, 389 U. S. 429 (1968), applies a duty upon imports in violation of Art. I, § 10, cl. 2, see *Hooven & Allison Co.* v. *Evatt*, 324 U. S. 652 (1945), invades the federal power over regulation of the entrance and residence of aliens in violation of Art. I, § 8, cl. 4, see *Hines* v. *Davidowitz*, 312 U. S. 52, 66–67 (1941), or attempts to tax income upon a federal obligation in derogation of Congress' Art. I, § 8, cl. 2, power to "borrow Money on the credit of the United States," see *Missouri ex rel. Missouri Ins. Co.* v. *Gehner*, 281 U. S. 313 (1930).   There is no textual or other support for holding that § 1983 imposes such far-reaching liabilities upon the States.

## II

Petitioner here does not complain that the State of Nebraska has failed to provide him an adequate forum in which to contest the validity of Nebraska's tax.   Nebraska has done so.   The Nebraska courts acknowledged the invalidity of the State's tax, enjoined its collection, and directed petitioner to file a refund claim for the taxes he had paid to the

State. Rather, the significance of the Court's decision, in this and future Commerce Clause litigation, is that a § 1983 claim may permit dormant Commerce Clause plaintiffs to recover attorney's fees and expenses under 42 U. S. C. § 1988.

In the Civil Rights Attorney's Fees Awards Act of 1976, Pub. L. 94–559, 90 Stat. 2641, codified at 42 U. S. C. § 1988, Congress authorized the award of attorney's fees to prevailing parties in, *inter alia*, § 1983 litigation. The award of attorney's fees encourages vindication of federal rights which, Congress recognized, might otherwise go unenforced because of the plaintiffs' lack of resources and the small size of any expected monetary recovery. See S. Rep. No. 94–1011, p. 6 (1976). Congress was reassured that § 1988 would be "limited to cases arising under our civil rights laws, a category of cases in which attorneys fees have been traditionally regarded as appropriate." *Id.*, at 4.

The significant economic interests at stake in dormant Commerce Clause cases, as well as the resources available to the typical dormant Commerce Clause plaintiff, make such concerns far removed from the realities of dormant Commerce Clause litigation. The pages of the United States Reports testify to the ability of major corporations and industry associations to commence and maintain dormant Commerce Clause litigation without receiving attorney's fee awards under § 1988. By making such fee awards available, the Court does not vindicate the purposes of § 1983 or § 1988, but merely shifts the balance of power away from the States and toward interstate businesses.

Today's decision raises far more questions about the proper conduct of challenges to the validity of state taxation than it answers. The Tax Injunction Act, 28 U. S. C. § 1341, prevents any attempt in federal court to "enjoin, suspend or restrain" assessment or collection of a state tax, so long as "a plain, speedy and efficient remedy may be had in the courts of such State." The principle of comity likewise prevents a federal court from entertaining any action for damages under

§ 1983 to redress allegedly unconstitutional state taxation. *Fair Assessment in Real Estate Assn., Inc.* v. *McNary*, 454 U. S. 100 (1981). Relying upon the "overriding interests of the state in an efficient, expeditious and nondisruptive resolution of . . . tax disputes," *Backus* v. *Chilivis*, 236 Ga. 500, 505, 224 S. E. 2d 370, 374 (1976), state courts have refused to permit plaintiffs to proceed under § 1983 where there exists a complete remedy under state law. *Ibid.; Spencer* v. *South Carolina Tax Comm'n*, 281 S. C. 492, 497, 316 S. E. 2d 386, 388–389 (1984), aff'd by an equally divided Court, 471 U. S. 82 (1985) *(per curiam)*. These questions now become of paramount importance, as we risk destruction of state fiscal integrity in a manner which may require congressional correction.

Today's opinion gives no hint of § 1983's character as an extraordinary remedy passed during Reconstruction to protect basic civil rights against oppressive state action. Section 1983 now becomes simply one more weapon in the litigant's arsenal, to be considered whenever the defendant is a state actor and its use is advantageous to the plaintiff. I dissent from the opinion and judgment of the Court.