**BOARD OF EDUCATION OF TOWNSHIP HIGH SCHOOL DISTRICT NO. 205, et al., Plaintiffs,**

v.

**Robert LEININGER, et al., Defendants.**

No. 85 C 8349.

United States District Court, N.D. Illinois, E.D.

March 29, 1993.

John H. Hager, Elaine K.B. Siegel, Michael Franklin Smith, Hager & Siegel, P.C., John M. Collins, Chicago, IL, for plaintiffs.

Colleen M. McLaughlin, IL Atty. Gen. Office, Chicago, IL, for defendants Theodore Sanders, Roland W. Burris.

Randolph Mitchell Johnston, Mark Edward Repp, Cook County State's Attys. Office, Chicago, IL, for defendant Richard J. Martwick.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

### STATEMENT OF FACTS

Plaintiffs, four individual school districts in Cook County, Illinois, have filed suit against Illinois' treasurer, comptroller, superintendent of education, and their regional superintendent over the regional superintendent's alleged mishandling of federal funds earmarked for their use. Plaintiffs allege that the regional superintendent has failed to immediately disburse to them funds distributed to the state pursuant to several federal educational funding statutes, and failed to invest the funds in interest-bearing vehicles while they were in his care. Plaintiffs contended these actions violated rights accorded them under the funding statutes [1], constituting a

---

1. These statutes are the Individuals with Disabili-   ties Education Act, 20 U.S.C. §§ 1400 *et seq.*, the

claim under 42 U.S.C. § 1983. Plaintiffs also alleged a number of state law claims against the regional superintendent.

The court has already ruled that plaintiffs do not have a cause of action under any of the statutes in question for interest on advance payments. Defendants' present motion to dismiss contends plaintiffs do not have a cause of action for interest on payments made under any of the federal statutes as a reimbursement, or for immediate payment of either advances or reimbursements upon disbursement of funds to the state. The court referred this matter to Magistrate Judge Pallmeyer, and has received her report and recommendation. Before the court are plaintiffs' objections to the report and recommendation.

## ANALYSIS

■ In the case of pretrial matters dispositive of a claim or defense of a party, once a timely objection has been filed to the magistrate judge's report and recommendation, the district judge shall conduct a de novo review upon the record. The court may accept, reject or modify the magistrate judge's recommended decision. Fed.R.Civ.P. 72(b). The court need not conduct a new hearing on the entire matter, but must give "fresh consideration to those issues to which specific objections have been made." 12 Wright & Miller, Federal Practice and Procedure, § 3076.8, at p. 56 (1992 Pocket Part).

The court agrees with the magistrate judge's conclusion that the funding statutes at issue do not provide plaintiffs with a cause of action under § 1983. A plaintiff may sue for a violation of a federal statute under § 1983 provided the statute creates an enforceable right, privilege or immunity within the meaning of § 1983, and Congress has not foreclosed such enforcement in enacting the statute. *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990). Whether the statute creates an enforceable right turns on whether its provisions at issue were intended to benefit the putative plaintiff. If so, the provisions create an enforceable right unless they merely reflect a congressional preference for a certain kind of conduct, rather than a binding obligation, or they are too vague and amorphous to be judicially enforceable. *Id.*

First, the court agrees with the magistrate judge's conclusion that plaintiffs were not the intended beneficiaries of the funding statutes at issue. A direct declaration of intent is not necessary. In *Wilder*, the court found health care providers to be intended beneficiaries of the Boren Amendment to the Medicaid Act based on language requiring state plans for medical assistance to provide for "payment ... of *hospital* services, *nursing facility* services, and services in an *intermediate care facility* for the mentally retarded provided under the plan." *Id.*, at 510, 110 S.Ct. at 2518 (emphasis in original); 42 U.S.C. § 1396a(a)(13)(A). A review of the language of the funding statutes plaintiff relies on indicates that where local governments such as plaintiffs are mentioned at all, it is only incidental to the statutes' declared purpose.

The statements of purpose of the National School Lunch Act and Child Nutrition Act declare they are intended "to safeguard the health and well-being of the Nation's children," indicating that children in general are the statutes' intended beneficiaries. 42 U.S.C. § 1751; 42 U.S.C. § 1771. Each statement of purpose also declares that Congress will "assist the States," but only as a means to accomplishing the end of aiding the statutes' true beneficiaries. Any benefit to the states is purely incidental, and no mention of local government is made at all.

Similarly, the Education of Individuals with Disabilities Act declares its purpose to provide an education to handicapped children and assure that their rights, and those of their parents, are protected. 20 U.S.C. § 1400(c). While the statute mentions both state and local governments, once again they are positioned as merely conduits of federal aid to the statute's true beneficiaries. Unlike the Boren Amendment, there is no lan-

---

Carl D. Perkins Vocational Education Act, 20 U.S.C. §§ 2301 *et seq.*, the National School Lunch Act, 42 U.S.C. §§ 1751, *et seq.*, and the

Child Nutrition Act of 1966, 42 U.S.C. §§ 1771, *et seq.*

guage separating providers of services to the public apart from the state government and obligating the state to repay them.

Finally, plaintiffs point to language in the Senate Labor and Human Resources Committee Report for the Perkins Act stating that the Act sends funds directly to local school districts or area vocational schools. However, it also states that the goal of this assistance is to provide quality vocational programs to needy populations. S.Rep. No. 221, 101st Cong., 2d Sess. 2 (1990), U.S.Code Cong. & Admin.News 1990, pp. 1182, 1183. Funds are clearly sent directly to local school districts to benefit the public in general, not the districts themselves.

Plaintiffs also direct the court to the holding in *Dennis v. Higgins,* 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) for the proposition that the intended beneficiaries of a federal statute may include more than ultimate recipients of services. *Dennis* does not address this issue at all, instead holding that the Commerce Clause of the United States Constitution was not merely intended to promote economic and political union, but to benefit all individual engaging in interstate commerce. *Id.,* at 449–51, 111 S.Ct. at 872. Nevertheless, the court does not disagree with the proposition plaintiffs seek to document. Certainly health care providers are not the ultimate recipients of services under the Boren Amendment. However, plaintiffs still cannot be considered beneficiaries of any of the funding statutes without language to that effect.

Second, the court agrees with the magistrate judge's conclusion that any provisions of the funding statutes directed toward plaintiffs are too vague and amorphous to be judicially enforceable, and do not create binding obligations on defendants either to immediately disburse funds or to pay interest on reimbursements. Plaintiffs have not presented any statutory or regulatory authority demonstrating any obligation to disburse funds immediately, and no timetables or schedules for payment exist under any of the statutes in question. Similarly, there is a noticeable dearth of authority obligating the state to pay interest to their local governments on federal funds intended for their use.

Plaintiffs have managed to construct an ingenuous argument for the existence of an enforceable obligation by relying on each statute's requirement that funds be spent for program purposes. Plaintiffs contend that, if funds disbursed to the defendants are not immediately distributed to them, then during that interim period they are being used for non-program purposes, unless the interest accrued during that period is distributed to them as well. Another variation of this argument was tried, and rejected by the Seventh Circuit in *Illinois Council on Long Term Care v. Bradley,* 957 F.2d 305 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992). There, the plaintiffs argued that any delay in payment of federal funds disbursed to the state under the Boren Amendment violated the Amendment's requirement that payments be "adequate" for reimbursement. The Seventh Circuit rejected this logical construct, pointing to the Amendment's total lack of language or references to time limits, and the lack of any references in the supporting regulations. *Id.,* at 307–08. As the *Bradley* court put it, "the question is not what reimbursement scheme might make sense but whether the Boren Amendment requires timely payment." *Id.,* at 308. Plaintiffs' claim here must be similarly rejected, for the same reasons.

Plaintiffs also contend that the requirements of each funding statute that payment be made "promptly" is not so vague or ambiguous as to be unenforceable, attempting to distinguish these statutes from the Adoption Assistance and Child Welfare Act, considered in *Suter v. Artist M,* —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). To begin with, only the National School Lunch Act contains even this minimal allusion to timely payments. None of the statutes in question use more binding language, such as "immediately," or contain timetables for payment. Contrary to plaintiffs' assertion, the lack of any further statutory guidance makes this case exactly like *Suter. Suter,* at ——, 112 S.Ct. at 1368.

■ The court also agrees with the magistrate judge's conclusion that the Intergovernmental Cooperation Act overrides plaintiffs' claim for interest on reimbursements. 31 U.S.C. § 6501, *et seq.* Section 6503(c)(1) of the Act requires the states to pay interest on federal funds deposited with them from the time such funds are deposited until they are paid out, but the interest goes to the United States. This provisions guts plaintiffs' basis for any right to interest on either advances or reimbursements. Plaintiffs point out that § 6503(d)(1) entitles the states to receive interest from the federal government on reimbursements, but this cannot be construed to entitle local government to receive interest from the state for the period after the funds are deposited with the state.

## CONCLUSION

■ For the foregoing reasons, the court accepts and adopts the magistrate judge's excellent report and recommendation. Accordingly, Counts I and II of the second amended complaint are dismissed with prejudice as to all defendants. Dismissal of these counts removes all basis for the court's original jurisdiction. The court therefore declines to exercise supplemental jurisdiction over the remaining state law counts of the complaint. 28 U.S.C. § 1367(c)(3). Counts III through V are therefore dismissed without prejudice for lack of subject matter jurisdiction.

## REPORT AND RECOMMENDATION

PALLMEYER, United States Magistrate Judge.

This case challenges the procedures through which federal funding is routed to local school districts by state agencies. Plaintiffs, the Boards of Education of four Cook County school districts (Township High School District Number 205, Consolidated High School District Number 230, Community High School District Number 233, and Community Consolidated School District Number 54), individually and on behalf of all entities similarly situated, seek declaratory and injunctive relief and damages from Defendants, State Superintendent of Education Robert Leininger, Illinois State Comptroller Roland W. Burris, Illinois State Treasurer Jerome Cosentino, and Regional Superintendent of Education of Cook County Richard J. Martwick, individually and in their official capacities.

Plaintiffs allege that Defendants are the first recipients of federal funds earmarked for educational programs. Rather than immediately disbursing these funds to the school districts that provide educational services, Plaintiffs contend, Defendants instead apply the monies to short-term investments for Defendants' own use. Plaintiffs contend that Defendants' use of these funds wrongfully impairs Plaintiffs' entitlement to these payments and violates various federal funding statutes and federal mandates which require that the funds be disbursed immediately. Before this court are Defendants' motions to dismiss. For reasons that follow, the motions should be granted.

## I. FACTUAL BACKGROUND

Plaintiffs receive federal financial assistance from the State of Illinois to be used in various educational programs. Plaintiffs operate these programs pursuant to certain federal statutes and their implementing regulations. Once federal government awards are granted to the state, the Defendant Illinois State Treasurer of the State of Illinois deposits the funds in interest-bearing accounts prior to disbursing them to Plaintiffs, the subgrantees. The Illinois State Board of Education determines the amount of financial assistance to which each subgrantee is entitled and directs the Comptroller of the State of Illinois to draw a warrant upon the Treasurer payable to the regional superintendents. The Treasurer then disburses the money upon presentment of the warrants by regional superintendents, including Defendant Regional Superintendent Martwick, or retains the funds in an interest-bearing account prior to disbursement. The regional superintendents are responsible for disbursing the funds to the local school district. Plaintiffs allege that certain federal funding statutes obligated Defendant Martwick to invest the funds so that they earn interest at market rates during the period the funds are held and then to promptly disburse the

funds, together with earned interest, to the school districts. Instead, according to Plaintiffs, Defendant Martwick distributes the principal payments only some time after he receives them and distributes them to Plaintiffs on a schedule of his own choosing.

### A. *The First Complaint*

In September 1985, Plaintiffs filed a twelve-count complaint claiming that Defendants failed to invest federal funds at market interest rates and failed to disburse to the school districts interest earned on federal funds during holding periods following the state agencies' receipt of the funds. Plaintiffs divided themselves into two groups: the "Illinois class," which received federal funds disbursed through the Illinois State Board of Education and/or the Treasurer, and the "Cook County class," which received federal or state financial assistance disbursed through the Regional Superintendent.

In Counts I, II, and III, Plaintiffs invoked remedies made available by 42 U.S.C. §§ 1983 and 1988. Count I named the Illinois class against the State Defendants; Count II named the Cook County class against the Regional Superintendent; and Count III named the Cook County class against Defendant Amalgamated Trust & Savings Bank ("Bank"), the financial institution in which the funds were held prior to disbursement. Plaintiffs sought a declaration that Defendants had a duty under the federal funding statutes to disburse to the school districts all interest earned on the federal assistance during the holding periods (Counts I, II, and III), to disburse the assistance within the time required by law (Count I), and to establish procedures to assure that the holding periods did not exceed that allowed by the federal statutes (Count I). Plaintiffs also sought injunctive relief, damages equal to the interest earned during the holding periods to date, prejudgment inter-

est, and costs and attorney's fees. In addition, Plaintiffs requested a declaration of the appropriate market rates of interest applicable to the federal funds.

Counts IV–VI sought relief under five acts which Plaintiffs termed the "federal funding statutes," namely, (a) the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (1988 & Supp. II 1990);[1] (b) the Carl D. Perkins Vocational Education Act, 20 U.S.C. §§ 2301 *et seq.* (1988 & Supp. II 1990); (c) the Education Consolidation and Improvement Act of 1981, 20 U.S.C. §§ 3801 *et seq.* (repealed 1988);[2] (d) the National School Lunch Act, 42 U.S.C. §§ 1751 *et seq.* (1988 & Supp. I 1989); and (e) the Child Nutrition Act of 1966, 42 U.S.C. §§ 1771 *et seq.* (1988). As in Counts I–III, Count IV named the Illinois class against the State Defendants, Count V named the Cook County class against the Regional Superintendent; and Count VI named the Cook County class against the Bank. In Counts IV, V, and VI, Plaintiffs sought the same relief they requested in Counts I, II, and III.

In Counts VII and VIII, Plaintiff Cook County class asserted state law claims under the School Code of Illinois, Ill.Rev.Stat. ch. 122, paras. 1–1 *et seq.* (1991), against the Regional Superintendent and against the Bank, seeking relief similar to that requested in the other counts. In Count IX, the Cook County class brought a state law claim for unjust enrichment against the Regional Superintendent, Cook County, the Board of Commissioners of Cook County, and the Commissioners in their individual capacities, alleging that the Regional Superintendent deposited the federal funds with Defendant Bank prior to disbursement. According to Plaintiffs' allegations, the Bank rendered to the Regional Superintendent the services of wire transferring and mailing federal funds to the school districts at no charge in ex-

---

1. Pursuant to a 1990 amendment that went into effect October 1, 1990, the former "Education for the Handicapped Act" was renamed the "Individuals with Disabilities Education Act" and provisions relating to "handicapped children" were replaced by provisions relating to "children with disabilities." Pub.L. 101–476, title IX, § 901(a)(1), (b)(1)–(9), Oct. 30, 1990, 104 Stat. 1141, 1142.

2. The Education Consolidation and Improvement Act, a program of financial assistance to meet the special educational needs of disadvantaged children, was repealed effective July 1, 1988 by Pub.L. 100–297, title I, § 1003(a), Apr. 28, 1988, 102 Stat. 293.

change for the Bank's use of the federal funds during the holding periods. Count X alleged the same claim against Defendant Bank. Under both Counts IX and X, Plaintiffs sought the amount of the value to which Defendants were unjustly enriched, i.e., the greater of either the market value of the wire transferring and mail services rendered by the Bank, or an amount equal to the market rate of interest on the federal funds during the holding periods.

In Count XI, Plaintiff Cook County class alleged two negligence claims against Defendant Cook County, Defendant Board of Commissioners, and Defendant Commissioners in their individual capacities: (1) these Defendants were negligent in failing to reject the Regional Superintendent's annual reports, which did not reflect disbursements in an amount representing the interest that should have been earned on the federal funds during the holding periods; and (2) these Defendants were negligent in failing to increase the penalty of a bond issued by Defendant Western Surety Company on behalf of the Regional Superintendent in favor of the County Board to an amount commensurate with the amount of—and the Regional Superintendent's responsibility for—the federal funds. Plaintiffs sought an amount representing the interest that the Regional Superintendent should have disbursed.

Count XII alleged a contract claim by the Cook County class against Defendant Western Surety Company, which had issued the bond on behalf of the Regional Superintendent in favor of the County Board in the sum of $25,000 and had conditioned the bond upon the faithful discharge of the Regional Superintendent's duties. Plaintiffs alleged that the Regional Superintendent breached his duty by failing to earn and disburse interest on the federal funds during the holding periods. As relief, Plaintiffs sought the amount of the surety bond.

The State Defendants moved to dismiss Counts I and IV on the grounds that any claim for money damages against the state was barred by the Eleventh Amendment and that both counts failed to state a claim upon which relief may be granted. The County Defendants and the Western Surety Compa-ny moved to dismiss Counts II, V, VII, IX, XI, and XII pursuant to Fed.R.Civ.P. 12(b)(6). The Amalgamated Trust and Savings Bank moved to dismiss Counts III, VI, VIII, and X for failure to state a claim upon which relief may be granted.

In May 1987, District Judge John A. Nordberg referred this case to Magistrate Judge Joan Humphrey Lefkow for a Report and Recommendation on Defendants' motions to dismiss. In April 1988, Magistrate Judge Lefkow recommended granting Defendants' motions to dismiss for failure to state a claim; the Magistrate Judge did not find that any of the federal statutes or regulations conferred a right upon Plaintiffs to receive interest earned on the federal grants prior to the disbursement of such funds to the local agencies.

In September 1989, Judge Nordberg issued a memorandum opinion and order, in which he: (1) dismissed the Illinois State Board of Education as a defendant in this case with prejudice on Eleventh Amendment grounds; (2) dismissed the Amalgamated Trust and Savings Bank from Counts III, VIII, and X without prejudice, and granted Plaintiffs leave to file an amended complaint; (3) dismissed with prejudice Counts IV, V, and VI which were based on the federal funding statutes; (4) adopted the Recommendation of Magistrate Judge Lefkow with regard to Counts I, II, and III that Plaintiffs had no per se right to the interest earned on federal advances, and postponed ruling on whether Plaintiffs have a right under the federal funding statutes to interest earned on reimbursements or a right to prompt disbursement of any federal funds (advances or reimbursements) pending further briefing; (5) deferred ruling on the state law claims in Counts VII, IX, and XI; (6) dismissed Counts IX and XI with prejudice to the extent that they sought to state claims against the Cook County Board of Commissioners or the Commissioners themselves in their official capacities; and (7) dismissed Counts IX and XI without prejudice with respect to Cook County and the Commissioners in their individual capacities for lack of subject matter jurisdiction. 1989 WL 106610.

## B. *The Second Amended Complaint*

Plaintiffs' second amended complaint, filed February 6, 1990, contains only five counts. In Count I, Plaintiffs allege, pursuant to 42 U.S.C. § 1983, that Defendants deprived the Illinois schools of federal funds, prompt disbursement of the funds, and reimbursement of expenditures for program purposes. Count II asserts the same claims also pursuant to § 1983, against Regional Superintendent Richard J. Martwick on behalf of the Cook County schools. In Count III, Plaintiffs allege that the Regional Superintendent breached his fiduciary duty in administering the federal and state financial assistance. Count IV alleges that the Regional Superintendent violated the Illinois Public Funds Investment Act, Ill.Rev.Stat., ch. 85, paras. 900 *et seq.* (1991), and the Illinois Public Funds Deposit Act, Ill.Rev.Stat. ch. 102, paras. 33.9 *et seq.* (1991). Finally, Count V alleges that the Regional Superintendent violated the equitable doctrine of unjust enrichment by allowing federal and state funds to be deposited at below market rates of return rather than promptly disbursing the public funds to Cook County schools.

On March 1, 1990, Defendants Leininger, Burris, and Cosentino moved to dismiss Count I of Plaintiffs' second amended complaint for failure to state a claim upon which relief may be granted. That same day, Defendant Martwick filed his motion to dismiss, also for failure of the complaint to state a claim upon which relief may be granted. Briefing on the motion was completed on September 20, 1990. Judge Nordberg referred the case to Magistrate Judge Lefkow on December 14, 1990 for a Report and Recommendation on Defendants Leininger, Burris, and Cosentino's motion to dismiss and Defendant Martwick's motion to dismiss. This case was reassigned to these chambers pursuant to an order of the Executive Committee dated October 10, 1991.

## II. DISCUSSION

On a motion to dismiss, the court must limit its inquiry to the sufficiency of the facts alleged in the complaint. The court must accept as true the allegations of the complaint, and draw all reasonable inferences in favor of the plaintiffs. *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985); *Illinois Hosp. Ass'n v. Edgar,* 765 F.Supp. 1343, 1347 (N.D.Ill.1991). The case may be dismissed only if it appears beyond doubt that plaintiffs will be unable to prove any set of facts entitling them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

## A. *Counts I and II: Section 1983 Actions*

Section 1983 provides a private cause of action for the "deprivation of any rights, privileges, or immunities, secured by the Constitution and laws" of the United States. In *Maine v. Thiboutot,* 448 U.S. 1, 6–8, 100 S.Ct. 2502, 2505–2506, 65 L.Ed.2d 555 (1980), the Supreme Court recognized that § 1983 provides a cause of action not only for violations of the Constitution, but also for violations of federal statutes. Since *Thiboutot,* the Court has recognized two exceptions to the application of § 1983 to federal statutory violations. First, no cause of action will lie where the relevant statute does not " 'create enforceable rights, privileges, or immunities within the meaning of § 1983.' " Second, § 1983 is unavailable where " 'Congress has foreclosed such enforcement of the statute in the enactment itself.' " *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990) (quoting *Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)).

### 1. Enforceable Rights within the Meaning of Section 1983 and the *Wilder* Test

Plaintiffs' central claim here is that Congress, through its federal funding statutes, bestowed upon school districts an enforceable right to recover interest on reimbursement claims and an enforceable right to "immediate" payment of claims.[3] Plaintiffs contend

---

3. In his earlier memorandum opinion and order, Judge Nordberg held that Plaintiffs had no right to interest per se on advances. (Mem. op., at 23). He deferred the issue, however, of whether Plaintiffs may have an enforceable right to interest on "reimbursements"—that is, federal funds

Defendants violated such rights by improperly holding grant funds, and the accrued interest from these funds, for investment purposes. Plaintiffs charge that their enforceable right to have funds "applied to program purposes" is being violated by the State's failure to pay their claims immediately, with interest. Defendants argue that federal regulations and other legal authority negate any such rights to "immediate" payment of "reimbursement claims." The central issue before this court is whether the federal funding statutes in question create the kind of rights Plaintiffs attempt to enforce here.

Unfortunately, the parties briefed the motions to dismiss only shortly before the Supreme Court issued its ruling in *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). *Wilder* held that hospital recipients of medical funds have a cause of action under § 1983 to enforce rights created by a statute enacted pursuant to the Spending Clause. The parties did supplement their briefing following the issuance of *Wilder,* however, and accordingly, did have an opportunity to discuss the significance and application of that decision to the present case.

*Wilder* described a three-part test for courts to apply in determining whether a federal statute creates an "enforceable right" within the meaning of § 1983. The court must assess (1) whether the pertinent statutory provision " 'was intend[ed] to benefit the putative plaintiff.' " *Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517 (quoting *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989)). If the provision was so intended, then that plaintiff has an enforceable right under § 1983 unless: (2) the statute "reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit," *Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517 (quoting *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 19, 101 S.Ct. 1531, 1541, 67 L.Ed.2d 694 (1981)); or unless (3) the plaintiff's interest is so " 'vague and

amorphous' " as to be " 'beyond the competence of the judiciary to enforce.' " 496 U.S. at 509, 110 S.Ct. at 2517 (quoting *Golden State,* 493 U.S. at 106, 110 S.Ct. at 448, and *Wright,* 479 U.S. at 431–32, 107 S.Ct. at 774–75).

In *Wilder,* a health care provider sued the state under § 1983 for failing to set reasonable and adequate reimbursement rates as required by the Boren Amendment to the Medicaid Act. 42 U.S.C. § 1396a(a)(13)(A) (1988). Under that amendment, states participating in Medicaid are required to reimburse health care providers for medical services provided to the needy. Federal financial assistance is provided to states that comply with the requirements of the amendment, although participation in the program is voluntary. The Boren Amendment requires, further, that the reimbursement rates be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 42 U.S.C. § 1396a(a)(13)(A). Plaintiff providers argued that the ratio at which the State of Virginia compensated them violated the requirement of reasonable need and adequacy, and urged that § 1983 provided a cause of action to enforce that requirement. The state argued that the amendment does not create an enforceable right, partly because it was too vague and ambiguous.

Although the amendment does not define "reasonable and adequate," the *Wilder* Court found that the statute's reimbursement provision sufficiently satisfies each element of the three-part test. First, the Court inquired whether the health care providers are the intended beneficiaries of the amendment. The Court determined that there was "little doubt" that the reimbursement provision of the Boren Amendment is intended to benefit the plaintiff providers of Medicaid services:

> The provision establishes a system for reimbursement of providers and is phrased in terms benefiting health care providers: It requires a state plan to provide for "payment ... of the *hospital* services,

---

intended to reimburse Plaintiffs for working capital that they had already expended. Judge Nordberg also declined to rule on the issue of whether Plaintiffs had a right to prompt, immedi-

ate disbursement of the federal funds—either advances or reimbursements. (Mem. op., at 24). *See infra* pp. 532–534.

*nursing facility* services, and services in an *intermediate care facility* for the mentally retarded provided under the plan."

496 U.S. at 510, 110 S.Ct. at 2518 (quoting 42 U.S.C. § 1396a(a)(13)(A)) (1982 ed., Supp. V).

Second, the Court considered whether the express wording of the Boren Amendment imposes a "binding obligation" on the state that would give rise to enforceable rights. The Court observed that the Secretary of Health and Human Services expressly conditions provision of federal funds on the state plan's compliance with the amendment. Because compliance with the federal statute is a condition precedent to the receipt of federal funding, the Court found that the statute sets forth more than a congressional preference; the statute imposes a binding obligation on states participating in the Medicaid program to establish and maintain reasonable reimbursement rates. The Court focused on the mandatory nature of the amendment: the state plan "must" pay hospitals in accordance with rates found by the state to be reasonable and adequate.

Finally, the Court considered whether the "reasonable and adequate" provision of the amendment is too "vague and amorphous" to be judicially enforceable. The Court observed that the Boren Amendment provides even more guidance than the provision at issue in *Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), that was found to create rights enforceable under § 1983. 496 U.S. at 519 n. 17, 110 S.Ct. at 2522 n. 17. In *Wright,* the Court had held that a provision for a "reasonable" allowance for utilities in the Brooke Amendment to the United States Housing Act of 1937, 42 U.S.C. § 1437a (1988 & Supp. I 1989), and its implementing regulations, which vested in the housing authority substantial discretion for setting utility allowances, were sufficiently specific and definite to constitute an enforce-

able right and were not beyond the competence of the judiciary to enforce. 479 U.S. at 431–32, 107 S.Ct. at 774–75. Against the backdrop of its holding in *Wright,* the Court in *Wilder* concluded that the Boren Amendment and accompanying regulations set forth factors for the state to consider in calculating the rates at which to reimburse hospitals.[4] Neither the majority nor the dissent found the statutory right of health care providers to "reasonable and adequate" reimbursement so vague and amorphous as to be "beyond the competence of the judiciary to enforce." 496 U.S. at 519–20, 110 S.Ct. at 2522–23; *id.* at 527–28, 110 S.Ct. at 2526–27 (Rehnquist, C.J., dissenting).

The *Wilder* Court noted that Congress adopted a flexible standard, allowing the states to select any method that would determine "reasonable" reimbursement rates. This flexible standard did not render the amendment unenforceable, however, the Court reasoned, because an inquiry into the reasonableness of reimbursement rates is well within the competence of the judiciary. The Court also noted that the amendment requires each state to measure the reasonableness of the rates against the "objective benchmark of an 'efficiently and economically operated facility.'" *Id.* at 519, 110 S.Ct. at 2523 (quoting the Boren Amendment).

## 2. The Federal Funding Statutes and Section 1983 Enforceable Rights

Plaintiffs here suggest in their supplemental memoranda that the federal funding statutes meet the three-prong test applied in *Wilder.* They contend that the statutes and their implementing regulations confer enforceable rights under § 1983 upon the school districts. With little elaboration, Plaintiffs assert that *Wilder* "defeats" Defendants' argument that the federal funding statutes are designed to benefit impoverished school children rather than the school districts that provide the services needed by the

---

**4.** The Court observed that the Boren Amendment specifically identifies the following factors as relevant to the determination of methods for calculating rates that are reasonably related to the costs of an efficient hospital: (1) the unique situation, financial and otherwise, of a hospital that services a disproportionate number of low

income patients, (2) the statutory requirements for adequate care in a nursing home, and (3) the special situation of hospitals providing inpatient care when long term care at a nursing home would be sufficient but is unavailable. 496 U.S. at 519 n. 17, 110 S.Ct. at 2522 n. 17, citing 42 U.S.C. § 1396a(a)(13)(A).

children. (Plaintiffs' Memorandum of Supplemental Authority in Opposition to Defendants' Motion to Dismiss, at 2). As support for this assertion, Plaintiffs merely cite to the portion of the *Wilder* opinion setting forth the three-part test and conclude that the "reasoning in *Wilder* applies to the funding statutes that the School Districts seek to enforce." *Id.* at 3.

The *Wilder* decision considered specific language of the Boren Amendment in significant detail. Plaintiffs here, however, fail to identify specific language in any of the four statutes at issue here that satisfies the test applied in *Wilder*. In particular, Plaintiffs have not met the first and third elements of the three-part test: Plaintiffs have not demonstrated that the school districts are the intended beneficiaries of the individual funding statutes, nor have they shown that the statutes are not so vague and amorphous as to be unenforceable by the courts.

Plaintiffs here maintain that the context of the statutes and their legislative history reveal a congressional intent "to promote educational and nutritional services, and to assist their providers in serving the public." (Plaintiffs' Response to Motions to Dismiss, at 15). Plaintiffs also assert that they have met the second prong of the test by showing that the express wording of the federal funding statutes imposes a "binding obligation" on the states that gives rise to enforceable rights. Finally, Plaintiffs intimate that the language of the federal funding statutes are sufficiently clear to satisfy the third element of the *Wilder* test requiring that the relevant provisions not be so "vague and amorphous" as to be judicially unenforceable. Lumping together all of these statutes, Plaintiffs baldly aver that each one contains a clear directive: "Federal funds must be applied to *program purposes.... The mandate is crystal clear. It is imperative.*" (Plaintiffs' Memorandum of Supplemental Authority in

Opposition to Defendants' Motion to Dismiss, at 3). Disappointingly, Plaintiffs have made no attempt to demonstrate how *each* of the funding statutes imposes such a "mandate." This court itself will engage in a brief analysis of this issue in the following pages.

### a. The Carl D. Perkins Vocational Education Act

Plaintiffs contend that the Vocational Education Act, 20 U.S.C. §§ 2301 *et seq.* (1988 & Supp. II 1990), confers enforceable rights upon school districts. In seeking to demonstrate that the school districts were the intended beneficiaries of the Act, Plaintiffs quote directly from the Act's statement of purpose. (Plaintiffs' Response to Motions to Dismiss, at 15). A 1990 amendment[5] to the Vocational Education Act, however, completely revised the statement of purpose, limiting it to a simple declaration of intent to make the United States more competitive in the world economy "by developing more fully the academic and occupational skills of all segments of the population." 20 U.S.C. § 2301. As the amended language sets forth, this purpose is to be achieved principally through concentrating resources on the improvement of educational programs leading to academic and occupational skill competencies needed for work in a technologically advanced society. 20 U.S.C. § 2301.

This amended statement of purpose lends no support to Plaintiffs' contention that the Act envisioned school districts as the intended beneficiaries. The legislative history of the amendment, in fact, confirms that the Act was intended to provide quality programs to people in need.[6] Unlike the statute considered in *Wilder*, the Vocational Education Act contains no explicit language identifying school districts as the intended beneficiaries of the amendment. The plain language of the amended statement of purpose cannot be read to express any suggestion but that

---

5. A new amendment, which became effective July 1, 1991, greatly shortened the Act's former statement of purpose. Pub.L. 101–392, § 2, Sept. 25, 1990, 104 Stat. 756. Although both parties reprinted portions of the former statement of purpose in their briefs, neither party provided any interpretation of the amended statutory language.

6. The Senate Report accompanying P.L. 101–392, which revised the statement of purpose of the Act, stated that the legislation "clearly indicates that the true purpose of federal assistance in vocational education is that of providing quality programs to needy populations." S.Rep. No. 221, 101st Cong., 2d Sess. 2 (1989), *reprinted in* 1990 U.S.C.C.A.N. 1182, 1183.

school children—and not school districts— were the intended beneficiaries of the Act. Thus Plaintiffs are unable to satisfy the first prong of the *Wilder* test. Plaintiffs also cannot meet the second prong of the test; the Act lacks mandatory language requiring state boards of education to disburse the funds in question within a particular time frame.

### b. The National School Lunch Act

Plaintiffs suggest that the National School Lunch Act, 42 U.S.C. §§ 1751 *et seq.* (1988 & Supp. I 1989),[7] confers enforceable rights upon the school districts. They contend that a congressional intent to benefit the school districts can be found in the Act's declaration of policy:

> It is declared to be the policy of Congress, as a measure of national security, to safeguard the health and well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other food, by assisting the States, through grants-in-aid and other means, in providing an adequate supply of foods and other facilities for the establishment, maintenance, operation, and expansion of nonprofit school lunch programs.

42 U.S.C. § 1751.

This declaration of policy merely presents the broad policy aims of the Act; nowhere is any reference made to the school districts themselves. The Act's stated intention was two-fold: (1) "to safeguard the health and well-being" of school children, and (2) "to encourage the domestic consumption of nutritious agricultural commodities." The policy of "assisting the States" in the provision of

foods and facilities serves only as an incentive mechanism for the states. This general policy of assisting the states to carry out the purposes of the Act does not create a system for reimbursing school districts. Unlike the situation in *Wilder* where the Boren Amendment explicitly required the state to reimburse hospitals at reasonable and adequate rates, the National School Lunch Act is not phrased in terms of benefitting school districts.

Plaintiffs also point to a provision in the School Lunch Act that requires the State Board of Education to promptly and equitably disburse federal financial assistance to the schools.[8] While the term "promptly" offers general guidance as to how much time is acceptable for states to take before disbursing the federal funds, Congress did not, as it is capable of doing, impose any particular payment schedule upon the states. Congress did not require the states, as urged by Plaintiffs in their complaint, to disburse the federal funds "immediately" to the school districts. (Second Amended Complaint, at 16). Consequently, the School Lunch Act cannot be construed to confer enforceable rights upon the school districts because it does not meet the first and third prongs of the *Wilder* test: the school districts have not been shown to be the intended beneficiaries of the Act, and the state's obligation to disburse the funds "promptly" is too vague and amorphous for the judiciary to enforce.

### c. The Child Nutrition Act of 1966

The Congressional declaration of purpose for the Child Nutrition Act, 42 U.S.C. §§ 1771 *et seq.* (1988), is nearly identical to that of the National School Lunch Act.[9] To

---

7. A 1989 amendment, which took effect on November 10, 1989, slightly amended the Congressional declaration of policy of the National School Lunch Act by substituting "school lunch" for "school-lunch." . Pub.L. 101–147, title III, § 312(1), Nov. 10, 1989, 103 Stat. 916.

8. The provision in the Act regarding disbursement for breakfasts and lunches reads, in part, as follows:

> Each State educational agency ... shall promptly and equitably disburse, [federal financial assistance] funds to schools participating in the school lunch program, and such

disbursements shall be used by such schools to purchase United States agricultural commodities and other foods for their food service program.

42 U.S.C. § 1755(b) (1988).

9. The Congressional declaration of purpose for the Child Nutrition Act provides in part:

> [I]t is hereby declared to be the policy of Congress that [the successful experience under the national school lunch program in the field of applied nutrition research] shall be extended, expanded, and strengthened under the authority of the Secretary of Agriculture as a

the extent that the language of these declarations of purpose parallel each other, therefore, the same reasoning above also applies in this case. Plaintiffs have not shown that Congress intended the school districts to be the intended beneficiaries of the Child Nutrition Act.

In contrast to the National School Lunch Act, the Child Nutrition Act does not contain any language requiring the state to disburse the federal funds "promptly" to the school districts.[10] The absence of any durational limitation on the state's duty to disburse the funds renders Plaintiffs' interest in a prompt distribution too vague and amorphous to be judicially enforceable. Because the first and third prongs of the *Wilder* test remain unfulfilled, the Child Nutrition Act cannot be deemed to give the school districts a right, enforceable under § 1983, to receive immediate reimbursement of funds from the state.

### d. The Individuals with Disabilities Education Act

The stated purpose of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (1988 & Supp. II 1990), is fourfold: (1) "to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs"; (2) "to assure that the rights of children with disabilities and their parents or guardians are protected"; (3) "to assist States and localities to provide for the education of all children with disabilities"; and (4) "to assess and assure the effectiveness of efforts to educate children with disabilities." 20 U.S.C. § 1400(c) (Supp. II 1990). The plain language of the statute

clearly identifies disabled children, rather than school districts, as the intended beneficiaries of the Act.

Case law interpreting this Act, as well as its precursor—the Education of the Handicapped Act ("EHA")—moreover, confirms that the statutes were designed for the benefit of school children rather than school districts. *See, e.g., Honig v. Doe,* 484 U.S. 305, 310, 108 S.Ct. 592, 597, 98 L.Ed.2d 686 (1988) ("[T]he EHA confers upon disabled students an *enforceable* substantive right to public education in participating States....") (emphasis added); *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley,* 458 U.S. 176, 189, 102 S.Ct. 3034, 3042, 73 L.Ed.2d 690 (1982) ("[T]he face of the [EHA] evinces a congressional intent to bring previously excluded handicapped children into the public education systems of the States and to require the States to adopt *procedures* which would result in individualized consideration of and instruction for each child."); *Angevine v. Jenkins,* 752 F.Supp. 24, 28 (D.D.C.1990) ("[T]he purpose of the [EHA] is only to give [plaintiff] access to the school...."), *rev'd on other grounds, Angevine v. Smith,* 959 F.2d 292 (D.C.Cir.1992); *but see Eberle v. Board of Public Educ. of School Dist. of Pittsburgh, Pa.,* 444 F.Supp. 41, 43 (D.Pa.1977) ("main purpose" of EHA "is the funding of special schools for the handicapped"), *aff'd,* 582 F.2d 1274 (3rd Cir.1978). Plaintiffs have not cited any cases suggesting that school districts, or even providers of school services, are the intended beneficiaries of the Act.

As with the Child Nutrition Act, the Individuals with Disabilities Education Act does not impose any timetables for payment dur-

---

measure to safeguard the health and well-being of the Nation's children, and to encourage the domestic consumption of agricultural and other foods, by assisting States, through grants-in-aid and other means, to meet more effectively the nutritional needs of our children.
42 U.S.C. § 1771 (1988).

**10.** For example, in regard to the special program to encourage consumption of fluid milk by children, the Child Nutrition Act provides: "The State educational agency shall *disburse* funds paid to the State during any fiscal year for purposes of carrying out the [special milk] program

under this section in accordance with such agreements approved by the Secretary as may be entered into by such State agency and the schools in the State." 42 U.S.C. § 1772(a)(10) (Supp. I 1989) (emphasis added). The Act does not specify any timetable with regard to the State's disbursement of apportioned funds for the school breakfast program either: "Funds apportioned and paid to any State for the purpose of this section shall be *disbursed* by the State educational agency *to schools selected by the State educational agency* to assist such schools in operating a breakfast program...." 42 U.S.C. § 1773(c) (1988) (emphasis added).

ing which the state must reimburse school districts with federal funds.[11] As a result, Plaintiffs cannot demonstrate that their request for prompt reimbursement is sufficiently clear and persuasive as to be judicially enforceable. When subjected to the requirements of the *Wilder* test, the Individuals with Disabilities Education Act does not confer § 1983 enforceable rights upon Plaintiffs.

In sum, Plaintiffs have failed to show that Congress intended through the four federal funding statutes to impose any particular schedule upon the states to pay reimbursement claims or interest on such claims. Although they claim that the federal funding statutes "express a far broader intent than defendants suggest," (Plaintiff Boards' Joint Response to Defendants' Motions to Dismiss Counts I and II of the Second Amended Complaint, at 15), Plaintiffs have evaded careful analysis of statutory language by reprinting at length entire portions of several of the acts in question. In providing such extensive quotations, Plaintiffs have literally heeded Judge Nordberg's call to identify specific statutory provisions governing reimbursement. They neglect, however, to marshall these sources in any analytical fashion in order to demonstrate that Congress indeed intended to benefit the school districts. Plaintiffs thus cannot show that the school districts have an enforceable right to interest earned on claims for reimbursement or to disbursement of federal funds within a specific time period.

### 3. Unambiguous Rights and the Suter Test

Even more recently than *Wilder*, the Supreme Court has reaffirmed that, where Congress intends to impose a condition on the grant of federal money, it must do so unam-biguously. *Suter v. Artist M.*, —— U.S. ——, ——, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992) (citing *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981)). In *Suter*, the Supreme Court chose not to explicitly apply the *Wilder* framework when determining whether the Adoption Assistance and Child Welfare Act of 1980 ("Adoption Act"), 42 U.S.C. § 620–628, 670–679a (1988 & Supp. I 1989), creates an enforceable right under § 1983 on behalf of private individuals. The Adoption Act conditions federal funding for state child welfare, foster care, and adoption programs upon, among other things, the state's express commitment to make "reasonable efforts" to prevent the need for removing children from their homes and "reasonable efforts" to facilitate reunification of families where removal had occurred. To participate in the program, states must submit a plan complying with sixteen requirements to the Secretary of Health and Human Services for approval.

Plaintiff children filed this class action suit under the Adoption Act against the defendant Director and the defendant Guardianship Administrator of the Illinois Department of Children and Family Services ("DCFS"), the state agency responsible for investigating charges of child abuse and neglect. Plaintiffs alleged that defendants, in contravention of 42 U.S.C. § 671(a)(15) (1988), failed to make such "reasonable efforts" by failing promptly to assign caseworkers to children placed in DCFS custody and by failing promptly to reassign cases when caseworkers were on leave from DCFS. —— U.S. at ——, 112 S.Ct. at 1364.

The district court denied defendants' motion to dismiss, holding in part that plaintiffs had a cause of action under § 1983 to enforce

---

11. A durational term, for example, is absent from the following provision of the Act:

The Secretary [of Education] shall make payments to each State in amounts which the State educational agency of such State is eligible to receive under this subchapter. Any State educational agency receiving payments under this subchapter shall distribute payments to the local educational agencies and intermediate educational units of such State in amounts which such agencies and units are eligible to receive under this subchapter after the State educational agency has approved applications of such agencies or units for payments. . . .

20 U.S.C. § 1420(a) (1988). The timing of such payments appears to be within the Secretary's discretion: "Payments under this subchapter may be made in advance or by way of reimbursement and in such installments as the Secretary of Education may determine necessary." 20 U.S.C. § 1420(b) (1988).

**530**

rights to preventive and reunification services under the Adoption Act. *Artist M. v. Johnson*, 726 F.Supp. 690, 696–97 (N.D.Ill. 1989) (Shadur, J.). Relying heavily on *Wilder*, the Court of Appeals affirmed and held that the "reasonable efforts" clause of the Adoption Act created enforceable rights which are sufficiently specific to be enforceable in an action under § 1983. *Artist M. v. Johnson*, 917 F.2d 980, 987 (7th Cir.1990).

Defendant Director appealed from this decision, and the Supreme Court reversed. The Court concluded that Congress did not unambiguously confer upon the child beneficiaries of the Act a right to enforce the requirement that the state exercise "reasonable efforts" to prevent a child from being removed from his home, and "reasonable efforts," where removal has occurred, to reunify the child with his family. The *Suter* Court found that the regulations promulgated by the Secretary of Health and Human Services to enforce the Adoption Act are not specific, and do not provide notice to the states that receipt of federal funds is conditioned on anything other than submission of a *plan* with the requisite features. —— U.S. at ——, 112 S.Ct. at 1369.

The *Suter* Court distinguished the Adoption Act from the statute in *Wilder*, observing that in *Wilder*:

we held that the Boren Amendment actually required the States to adopt reasonable and adequate rates, and that this obligation was enforceable by the providers. We relied in part on the fact that the statute and regulations set forth in some detail the factors to be considered in determining the methods for calculating rates.

—— U.S. at ——, 112 S.Ct. at 1368. The Court ruled that the Adoption Act, in providing that the state exercise "reasonable efforts" to maintain an abused or neglected child in his home or return the child to his home from foster care, leaves to the state's discretion the question of how to define "reasonable efforts." Thus, reasoned the Court, the Adoption Act does not create an enforce-

able right. In reaching this conclusion, the Court emphasized that the right allegedly created by Congress must be specific and unambiguous:

Careful examination of the language relied upon by respondents, in the context of the entire Act, leads us to conclude that the "reasonable efforts" language does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term "reasonable efforts" in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary. . . .

—— U.S. at ——, 112 S.Ct. at 1370. Thus, under *Suter*, any right allegedly established by Congress must be unambiguously conferred.[12]

Under the *Suter* standard, none of the federal funding statutes create a § 1983 right of action. These statutes do not create unambiguous, specific obligations for the state to provide a right to recover interest on reimbursement claims, nor do they confer upon the school districts any right to prompt payment of claims. Since none of the statutes propose a payment timetable or discuss the payment of interest on reimbursement claims, no specific substantive rights are unambiguously conferred on the school districts under the *Suter* guidelines. Under the rationale of *Suter*, where the Court declined to find enforceable § 1983 rights under the "reasonable efforts" clause of the Adoption Act, this court has little choice other than to find no enforceable rights under § 1983 on behalf of school districts under the federal funding statutes.

### 4. Congressional Foreclosure of a Section 1983 Action

A conclusion that the federal funding statutes do not create the federally enforceable rights asserted by Plaintiffs should ordinarily end this court's inquiry. *See Suter v. Artist M.*, —— U.S. ——, ———— n. 11, 112 S.Ct. 1360, 1368–69 n. 11, 118 L.Ed.2d 1

**12.** The Seventh Circuit recently applied this rule in concluding that an implementing provision to the Social Security Act does not create an enforceable right under § 1983. *Clifton v. Schafer*,

969 F.2d 278, 284 (7th Cir.1992) (implementing provision to Social Security Act, similar to Adoption Act provision in *Suter*, fails to explicitly impose specific requirements on the states).

(1992) ("We need not consider this question today [whether Congress intended to foreclose remedies under § 1983] due to our conclusion that the Adoption Act does not create the federally enforceable right asserted by respondents."). In the event, however, that this court concludes that the federal funding statutes do create enforceable rights, then the court must consider whether the statutes themselves set out a comprehensive remedial scheme which leaves no room for additional private remedies under § 1983.

In his September 1989 memorandum opinion, Judge Nordberg wrote:

> With respect to whether Congress has foreclosed section 1983 enforcement of any alleged rights granted under the federal funding statutes, the court concludes that the defendants have not as yet satisfied their burden of proving that the statutory remedial scheme is sufficiently comprehensive to preclude a cause of action under section 1983. They have not discussed the remedial scheme of the various statutes; nor have they discussed in any detail the enforcement mechanisms of the implementing regulations, other than to note that they provide for the withdrawal of federal funds in the event of certain violations.

(Mem. op., at 22). Plaintiffs contend that *Wilder* "conclusively" demonstrates that a § 1983 remedy has not been foreclosed by an enforcement scheme permitting the granting agency to withhold federal funds or plan approval as sanctions for noncompliance. (Plaintiffs' Memorandum of Supplemental Authority in Opposition to Defendants' Motion to Dismiss, at 6). They offer the conclusory assertion that the "enforcement scheme at issue in *Wilder* is the functional equivalent of the enforcement schemes here in issue." *Id.* at 7.

*Wilder* places the burden on the state to show " 'by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement.' " *Wilder,* 496 U.S. at 520–21, 110 S.Ct. at 2523 (quoting *Wright,* 479 U.S. at 423, 107 S.Ct. at 770). None of the federal funding statutes involved here expressly preclude resort to § 1983. In the absence of such an express provision, the courts have foreclosed private enforcement only when the statute itself establishes a remedial scheme that is " 'sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983.' " *Wilder,* 496 U.S. at 521, 110 S.Ct. at 2523 (quoting *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n.,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981)).

The *Wilder* Court noted that on only two prior occasions has the Supreme Court found a remedial scheme established by Congress sufficiently comprehensive to displace the remedy provided in § 1983. One of these cases involved the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (1988), which provides the Environmental Protection Agency with a panoply of enforcement measures, such as use of noncompliance orders, civil suits, and criminal penalties. *Middlesex County, supra.* The other instance arose in *Smith v. Robinson,* 468 U.S. 992, 1010–11, 104 S.Ct. 3457, 3467–68, 82 L.Ed.2d 746 (1984), where the Court found that the elaborate administrative scheme of the Education of the Handicapped Act ("EHA"), 20 U.S.C. § 1400 *et seq.* (1988 & Supp. II 1990), manifested Congress' intent to foreclose private reliance on § 1983 as a remedy. The EHA contains a "carefully tailored administrative and judicial mechanism," 468 U.S. at 1009, 104 S.Ct. at 3467, providing for local administrative review and culminating in a right to judicial review. *Id.* at 1011, 104 S.Ct. at 3468 (citing 20 U.S.C. §§ 1412(4), 1414(a)(5), 1415); *see also Alexander v. Chicago Park Dist.,* 773 F.2d 850, 856 (7th Cir.1985) (private actions based on Title VI of the Civil Rights Act of 1964, which provides its own remedial scheme, may not be brought under § 1983), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986); *cf. Smith v. Barton,* 914 F.2d 1330, 1335 (9th Cir.1990) (Rehabilitation Act of 1973 does not contain remedial structure sufficiently comprehensive to show that Congress intended to preclude handicapped employees' § 1983 claims based on the First Amendment), *cert. denied,* —— U.S. ——, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991). By analogizing in

sweeping fashion the facts of the case here to those in *Wilder*, Plaintiffs here overlook the *Wilder* Court's explicit observation that the "elaborate administrative scheme set forth in the [EHA] manifested Congress' desire to foreclose private reliance on § 1983 as a remedy." *Wilder*, 496 U.S. at 521, 110 S.Ct. at 2524.

In contrast to the elaborate remedial schemes set forth in the Water Pollution Control Act and the EHA, the remedies provided in the Vocational Education Act, the National School Lunch Act, and the Child Nutrition Act (and their implementing regulations) are not so comprehensive as to reflect a congressional intent to preclude private enforcement under § 1983. None of these statutes explicitly state that their remedies supplant § 1983 remedies. Defendants, with scarcely any elaboration, reprint at length more than nine pages of remedial provisions from the National School Lunch Act, the Child Nutrition Act of 1966,[13] the Vocational Education Act,[14] and the Education of the Handicapped Act. Merely quoting entire passages from this legislation alone, however, does not overcome Defendants' burden of demonstrating that Congress intended to foreclose such private enforcement. With the sole exception of the EHA (as described in *Wilder*), none of the federal funding statutes at issue is so comprehensive as to leave no room for private remedies under § 1983.

## 5. Plaintiffs' Right to Recover Interest on Reimbursement Claims

Plaintiffs argue that they are entitled to interest earned on reimbursements of federal funds pending disbursement by the State Defendants. (Second Amended Complaint, at 28). Plaintiffs allege that the State Defendants misapply federal funds by retaining accumulated interest from those funds in the state treasury rather than applying it to program purposes. (*Id.* at 13). At the same time, however, Plaintiffs confusingly suggest that Defendants will not invest the funds so as to generate interest at market rates unless this court specifically enjoins the Regional Superintendent to do so. (*Id.* at 21, 31–33). In addition, Plaintiffs ask the court to direct Defendants to disburse all such interest to the school districts and to pay damages in the amount of the interest that should have been earned on the federal funds prior to disbursement.

13. In support of their claim that the National School Lunch Act and the Child Nutrition Act of 1966 provide their own comprehensive enforcement schemes, Defendants quote from a provision of the Child Nutrition Act that allows the Secretary of Agriculture to withhold federal funds in instances where a state's administration of any program under either of the two Acts is "seriously deficient." 42 U.S.C. § 1776b (1988). Defendants also cite a regulation permitting the Food and Nutrition Service ("FNS") of the Department of Agriculture, in the event that a state agency fails to comply with relevant provisions, to suspend or terminate the National School Lunch Program or to "take any other action as may be available and appropriate." 7 C.F.R. § 210.25 (1992). These provisions, however, do not establish a remedial scheme sufficiently comprehensive to displace the remedy provided in § 1983. They do not provide, for example, a carefully tailored mechanism for judicial review. The limited oversight of the Secretary of Agriculture and FNS, furthermore, is insufficient to demonstrate an intent to foreclose relief altogether in the courts under § 1983. Finally, *Sowell's Meats and Servs., Inc. v. McSwain*, 788 F.2d 226 (4th Cir.1986), cited by Defendants to support their claim that the National School Lunch Act precludes resort to § 1983, is inapplicable here because that case concerned the civil rights action of a disappointed bidder to supply foodstuffs to a school district. The *Sowell's* court held that national school lunch program statutes and regulations specifying procurement standards for federal assistance programs do not confer standing on disappointed bidders under § 1983 to question the state agency's discretionary award of a procurement contract. *Id.* at 228. In contrast, Plaintiffs here allege that they have enforceable rights to immediate reimbursement of federal funds from the State.

14. To support their contention that Congress, in enacting the Vocation Education Act, had provided for a comprehensive remedial scheme such that private enforcement under § 1983 would be precluded, Defendants quote extensively from portions of the Act regarding judicial review that have since been repealed. Their reference to Judge Nordberg's observation from his 1989 Memorandum Opinion and Order acknowledging the statutory right of dissatisfied state boards of education to appeal the Secretary's decision is also outdated; effective July 1, 1991, the provision that formerly authorized judicial review, 20 U.S.C. § 2464 was repealed by Pub.L. 101–392, Title V, § 501(a)(1), Sept. 25, 1990, 104 Stat. 830.

In his memorandum opinion of 1989, Judge Nordberg determined that the parties had not adequately briefed the issue of whether Plaintiffs were entitled to interest earned on reimbursement of grant funds. Although he deferred ruling on whether Plaintiffs may have an enforceable right to interest on reimbursements, he directed the parties to address the issue through "*specific* references to any statutes and regulations governing reimbursement." (Mem. op. at 24). The parties, unfortunately, have not provided this court with citations to relevant statutory or legislative authority. Plaintiffs cite 7 C.F.R. § 210.5 (1992) as support for their claim that interest earned on reimbursement funds must be forwarded to the school boards; yet that provision merely states that the "State agency shall disburse [reimbursement] funds received from ... requests [by school food authorities] without delay for the purpose for which drawn." 7 C.F.R. § 210.5(a). Neither that provision, nor any of the others cited by Plaintiffs, offer any suggestion that Congress intended the school districts to receive interest pending disbursement of reimbursement funds.

Defendants, for their part, focus their discussion on the issue of interest earned on *advances* of grant funds [15]—which is not contested here [16]—rather than interest on *reimbursement* of grant funds. Defendants also rely on a provision, since amended [17], in the Intergovernmental Cooperation Act, 31 U.S.C. § 6503(a) (1988), that relieves states of accountability for interest earned on grant money pending disbursement for program purposes. Plaintiffs concede that this earlier provision obviated any requirement to remit such interest to the federal government; they argue, instead (albeit without any support in the statutory language) that Congress intended for the school districts to be the beneficiaries of that interest. Tellingly, the new provision, not scheduled to take effect until October 24, 1992, will obligate a state to pay interest "to the Federal Government" on the "float" time between transfer of federal funds and payment to program beneficiaries. H.Rep. No. 696, 101st Cong., 2d Sess. 12 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1691, 1700.[18] The new provision removes confusion over which party should receive the interest. It provides in no uncertain terms that the interest payments required of the

---

**15.** With regard to interest earned on advances of grant funds, the Code of Federal Regulations provides:

> (a) Except when exempted by [paragraph (b)], recipients shall remit *to the Federal government* any interest or other investment income earned on advances of USDA grant funds. This includes any interest or other investment income earned on advances of USDA grant funds....
> (b) In accordance with the Intergovernmental Cooperation Act of 1968 (42 U.S.C. 4213), States, as defined in the Act, shall not be accountable to the Federal government for interest or investment income earned by the State itself, or by its subrecipients, where this income is attributable to grants-in-aid, as defined in the Act.

7 C.F.R. § 3015.46 (1992) (citation omitted) (emphasis added). Although Defendants cite the Intergovernmental Cooperation Act, 42 U.S.C. § 4213, that provision was repealed by Pub.L. 97–258, § 5(b), Sept. 13, 1982, 96 Stat. 1068. That repeal has not yet been reflected in the most recent edition of the Code of Federal Regulations. In any case, Plaintiffs have offered no support for their claim that the school districts are the intended beneficiaries for any interest earned on federal funds pending disbursement for program purposes.

**16.** Judge Nordberg ruled in his earlier memorandum opinion that Plaintiffs had no right—either explicitly or implicitly—to interest on advances. (Mem. op., at 23). He observed there that the provision in 31 C.F.R. § 205(a), stating that advances be disbursed "as close as is administratively feasible," suggested that some time lag between advances and disbursements should not be actionable. (Mem. op., at 23 n. 13).

**17.** *See infra* notes 18 and 19.

**18.** The 1990 amendment provides as follows:

> The Secretary [of Treasury] shall issue regulations that shall require a State, when not inconsistent with program purposes, to pay interest to the United States on funds from the time funds are deposited by the United States to the State's account until the time that funds are paid out by the State in order to redeem checks or warrants or make payments by other means for program purposes.... [T]he interest payable under this subsection shall be calculated at a rate equal to the average of the bond equivalent rates of 13–week Treasury bills auctioned during the period for which interest is calculated, as determined by the Secretary.

31 U.S.C.A. § 6503(c)(1) (West Supp.1992).

State are to be made to the federal government, and not to the program beneficiaries. 31 U.S.C.A. § 6503(c)(1) (West Supp.1992). Plaintiff school districts have not shown that Congress intended that they should recover interest earned on the reimbursements; consequently, Defendants' motions to dismiss should be granted.

### 6. Plaintiffs' Rights to Immediate Payment of Claims

Plaintiffs also allege a right under the federal statutes and other legislation to Defendants' prompt, immediate disbursement of federal funds. They point out that the Intergovernmental Cooperation Act, for example, requires minimization of the time lapse during transmission of advances of grant funds to program providers.[19] Additionally, they again cite to 7 C.F.R. § 210.5(a), which provides that state agencies shall limit requests for funds for reimbursement to participating school food authorities to such times as will allow "prompt payment of claims or authorized advances." Since federal regulations such as § 210.5(a) require prompt application of reimbursement funds for the purpose for which drawn, Plaintiffs urge that any accruing interest must be forwarded to the school boards. (Plaintiffs' Response to Motions to Dismiss, at 9–10).

While the provisions cited by Plaintiffs reflect a general policy urging states to disburse federal funds as quickly as possible, they hardly provide support for Plaintiffs' sweeping assertion that there is an "unambiguous Congressional intent to require *immediate* disbursement of funds for program purposes." *Id.* at 11 (emphasis added). The regulations and legislative history cited by Plaintiffs here simply do not acknowledge

any right to "immediate" disbursement of federal funds.

Plaintiffs' reference to the provision concerning school food authorities, in fact, is misplaced; Congress has specifically established administrative procedures that school food authorities must comply with in order to qualify to receive federal money. The federal regulations require a school food authority to first provide a "proper request for reimbursement" to the state agency, which "ordinarily" will make payment within thirty days after receipt of that request. 7 C.F.R. § 3015.104 (1992).

Notably, none of the other federal regulations cited by Plaintiffs impose specific time requirements on the state for the payment of reimbursement claims. Had Congress intended to bestow upon Plaintiffs an enforceable right to immediate payment of federal funds, it could have done so expressly and unambiguously, for example through the imposition of a mandatory timetable. In the absence of any reference in federal law to a payment schedule or time frame within which states must pay claims for reimbursement of federal funds, this court should not impose upon the state agency a payment schedule that is not grounded in federal legislation. Plaintiffs have no enforceable right to "prompt payment" of reimbursements.

### B. *Counts III, IV, and V: Pendent State Law Claims*

In Counts III, IV, and V, Plaintiffs bring pendent state claims against Defendant Regional Superintendent Richard J. Martwick for alleged breach of fiduciary duty,[20] breach of the Public Funds Investment Act and the Public Funds Deposit Act,[21] and for unjust

---

19. Public Law 101–453, which took effect on October 24, 1990, amended 31 U.S.C. § 6503(a) by providing that the federal agencies and the states shall minimize time elapsing between the transfer of federal funds and payment to program beneficiaries: "the State shall minimize the time elapsing between transfer of funds from the United States Treasury and the issuance or redemption of checks, warrants, or payments by other means for program purposes." 31 U.S.C.A. § 6503(a)(2) (West Supp.1992).

20. Plaintiffs allege in Count III that Regional Superintendent Richard J. Martwick breached

his fiduciary duty as the trustee of public funds by failing to invest such funds in interest-bearing bank accounts and to distribute interest to the Cook County schools. (Second Amended Complaint, at 32–33). Notwithstanding this court's lack of jurisdiction to hear this claim, Plaintiffs have not cited any federal or state statute that requires the Regional Superintendent to earn interest on funds held for minimal time periods.

21. Notably, these two statutes cited by Plaintiffs merely *authorize* a public agency or a custodian of public funds to invest public funds; the statutes do not *require* that all such funds be deposit-

enrichment.[22] Defendant Martwick moves to dismiss all three counts on the ground that the court no longer retains pendent claim jurisdiction over these state law counts once the § 1983 action is dismissed.[23]

In determining whether to retain or dismiss pendent state claims, the district judge has broad discretion in making a managerial judgment on whether to allow plaintiff to bring one case in federal court or force him to litigate his state claim in state court. *Duckworth v. Franzen,* 780 F.2d 645, 656 (7th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). When all federal claims are dismissed before trial, the district court should relinquish its pendent claim jurisdiction. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Landstrom v. Illinois Dep't of Children & Family Servs.,* 892 F.2d 670, 679–80 (7th Cir.1990); *Graf v. Elgin, Joliet and Eastern Ry. Co.,* 790 F.2d 1341, 1344 (7th Cir.1986). Since Plaintiffs' § 1983 action should be dismissed against Defendants, Plaintiffs' state law claims should also be dismissed.

## III. CONCLUSION

The lack of an enforceable right on behalf of the school districts under 42 U.S.C. § 1983 in each of the four federal funding statutes requires the conclusion that Congress nei-

ther expressly nor impliedly intended to create such protectible rights through this legislation. The motion to dismiss of Defendants Leininger, Burris, and Cosentino should be granted. The motion to dismiss of Defendant Martwick should also be granted. Since Plaintiffs' federal claims should be dismissed, the court can and should decline to take jurisdiction of the pendent state law claims.

cd. Ill.Rev.Stat. ch. 85, paras. 900 *et seq.* (1991); Ill.Rev.Stat. ch. 102, paras. 33.9 *et seq.* (1991). An exception applies in the case of "collected" funds which must be deposited within two working days at prevailing rates or better, *Id.* para. 34; Plaintiffs, however, have failed to show that Defendant Martwick holds such funds beyond that period. Plaintiffs appear to have no cause of action pursuant to these statutes.

**22.** Plaintiffs contends that Defendant Martwick should be held liable for the "fruits" of the use of public funds during holding periods, since the bank, in exchange for deposits of such funds, wire transferred and mailed these funds to Cook County schools at below-market rates of return. Plaintiffs claim that Martwick was unjustly enriched "to the extent of the value of the bank's wire transferring and mailing services." (Second Amended Complaint, at 36). Although they have not labelled their claim as such, Plaintiffs seem to allege that Martwick had a quasi-contractual obligation to the school districts to avoid unjust enrichment. In a quasi-contractual situation, a party unjustly receiving the benefit has an obligation to the benefit provider that is closely

akin to a duty to make restitution. *Midcoast Aviation, Inc. v. General Electric Credit Corp.,* 907 F.2d 732, 737 (7th Cir.1990). As Defendant Martwick points out, however, Plaintiffs have not demonstrated that they rendered a service to Defendant by which he benefitted. (Defendant Martwick's Motion to Dismiss, at 26). Plaintiffs, consequently, appear to have no claim under a quasi-contract or unjust enrichment theory.

**23.** In their reply brief, Plaintiffs seek to defer ruling on the state law counts in light of Judge Nordberg's admonition that "the parties are not to discuss the state-law claims without first having obtained this court's permission." (Mem. op., at 38). Judge Nordberg's directive was on its face limited to summary judgment motions, however, and both parties earlier took advantage of their opportunity to discuss the state law counts in their briefs. Thus, this court has addressed the state law counts in brief notes while recognizing that the district court may determine not to reach the merits of these counts.